AMERICAN BOOKSELLERS ASSOCIATION, INC., et al., Plaintiffs,

v.

James WEBB, et al., Defendants.

Civ. A. No. C84–697A.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 27, 1984.

J. Kirk Quillian, William N. Withrow, Jr., H. Carol Morris, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., Michael A. Bamberger, Jeffrey A. Mitchell, Finley,

Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, for plaintiffs.

George M. Weaver, Asst. Atty. Gen., Sibley & Weaver, Susan B. Forsling, Asst. County Atty., Atlanta, Ga., Jerry L. Gentry, Joseph C. Parker, Marietta, Ga., Sam F. Little, Terry L. Miller, Dalton, Ga., George P. Dillard, Decatur, Ga., for defendants.

## ORDER

SHOOB, District Judge.

### I. Introduction

■ This is an action for declaratory and injunctive relief challenging the constitutionality of recently enacted provisions of Georgia law governing the distribution and display of sexually explicit materials to minors. Plaintiffs are various associations of booksellers, publishers, periodical distributors, college stores, and retailers, as well as two bookstores and an author, all of whom contend they will be directly and adversely affected by the new law.[1] Defendants are various local solicitors, sheriffs, and police officials who have authority to enforce the law.[2]

The provisions challenged by plaintiffs appear in Section 3 of Act No. 1319 (the "Act"), 1984 Ga.Laws 1495, 1496–1501, approved April 5, 1984, to take effect July 1, 1984. See O.C.G.A. § 1–3–4(a)(1) (Michie 1982) (governing effective date of legislative Acts). Section 3 of the Act amends Part 3 of Article 3 of Chapter 12 of Title 16 of the Official Code of Georgia Annotated, relating to the sale and distribution of harmful materials to minors, by repealing the current O.C.G.A. §§ 16–12–102 through

1. Although some of the defendants contend in their answers that plaintiffs lack standing to maintain this action, both at trial and in their briefs defendants have not disputed plaintiffs' standing to challenge the new law's constitutionality except with respect to the claim that the law infringes parents' rights to rear their children free from state interference. This relatively restricted challenge to plaintiffs' standing is addressed *infra* at 689–690. Otherwise, for the same reasons stated by this Court with respect to a similar challenge to an earlier Georgia statute on the same subject, the Court finds that plaintiffs have standing to maintain this action, and also that they have demonstrated the existence of the requisite "case or controversy" within the meaning of Article III of the U.S. Constitution. See *American Booksellers Ass'n v. McAuliffe*, 533 F.Supp. 50, 54–55 (N.D.Ga.1981).

2. The Attorney General of Georgia is not named as a defendant, but he has been served with a copy of the proceeding pursuant to O.C.G.A. § 9–4–7(c), and he has retained a special assistant attorney general, Mr. George Weaver, who acted as lead counsel at trial on behalf of most of the defendants.

16–12–104 (Michie Supp.1983) and inserting in lieu thereof new Code sections 16–12–102 through 16–12–104. (The new Code sections being challenged here are set out in full in the Appendix to this order. Amendments to the current law are indicated by striking through words deleted by the new Act and underlining words added by the new Act. Insignificant variations in punctuation and capitalization are not indicated.)

Plaintiffs filed their complaint on April 6, 1984, together with a motion for preliminary injunction or, in the alternative, for temporary restraining order. Since the challenged statute does not become effective until July 1, 1984, it was unnecessary to set the matter down for an immediate hearing, and the Court determined that the most expedient approach would be to consolidate trial on the merits with the hearing on the motion for preliminary injunction. Fed.R.Civ.P. 65(a)(2). Accordingly, following a short discovery period, this action came on for trial before the Court on May 31-June 1, 1984.

II. *Plaintiffs' Claims*

Plaintiffs bring this action pursuant to the first, fifth, and fourteenth amendments to the United States Constitution, 42 U.S.C. § 1983, and Article III, Section V, Paragraph III of the Georgia Constitution. Their complaint includes seven counts.

Count I of the complaint alleges that Section 3 of the Act is unconstitutionally overbroad in that it prohibits the furnishing or display of materials to minors that is not obscene as to minors. Count II alleges that Section 3, by virtue of its display provisions, violates adults' first amendment right of access to materials that are not obscene as to them. Count III alleges that Section 3 effects an unconstitutional prior restraint on free speech insofar as it restricts both the display and distribution of materials that are constitutionally protected both as to minors and adults. Count IV alleges that Section 3 is unconstitutionally vague in that it fails to provide fair notice as to what constitutes a criminal offense under the Act. Count V alleges that Sec-

tion 3's exemption of some libraries from its scope has no rational basis and therefore unconstitutionally denies plaintiffs the equal protection of the law. Count VI alleges that Section 3's blanket prohibition of *any* person's furnishing covered materials to minors violates a parent's fundamental right to rear his child free from interference by the state. Finally, Count VII alleges that Section 3 violates the Georgia Constitution's prohibition of the passage of any bill that refers to more than one subject matter.

III. *Abstention*

Before reaching the merits of plaintiffs' claims, the Court must address the threshold issue raised by defendants' motion to abstain, in which defendants contend that, under the standards announced in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), this Court should abstain from deciding the claims asserted by plaintiffs in favor of a prior state court resolution of certain unsettled questions of state law.

In *Pullman Co. v. Railroad Commission of Texas*, 33 F.Supp. 675 (W.D.Tex. 1940), the company asked a federal district court to enjoin enforcement of an order of the Texas Railroad Commission, claiming both that the order denied its rights under the fourteenth amendment to the United States Constitution and that it was invalid under Texas law. Without reaching the federal constitutional issues, the district court held that the challenged order was unauthorized under Texas law and enjoined its enforcement. 33 F.Supp. at 677–78. On direct review the Supreme Court held that the district court should have abstained from deciding the case. Since "the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas," only abstention in favor of a state court adjudication of the state law issue would "avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Pullman, supra*, 312 U.S. at 500, 61 S.Ct. at 645.

As subsequently formulated by the Supreme Court, *Pullman*-type abstention may be proper "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law...." *Harman v. Forssenius*, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965); *see also Duke v. James*, 713 F.2d 1506, 1510 (11th Cir.1983). Defendants argue that two claims raised by plaintiffs independently warrant the application of *Pullman* abstention here: first, plaintiffs' contention in Count VII of their complaint that the Act is invalid under the Georgia Constitution; and second, plaintiffs' claims in Counts II and III of the complaint that the Act's display provisions violate adults' first amendment rights. The Court will address the abstention question with respect to each of these claims in turn.

### A. The State Constitutional Issue

Sections 1 and 2 of Act No. 1319, 1984 Ga.Laws 1495, 1495–96, amend O.C.G.A. §§ 16–6–4(b) and 16–6–5, relating to the punishment for child molestation and enticing a child for indecent purposes, respectively; whereas Section 3, which plaintiffs challenge here, relates solely to the sale and display of materials deemed harmful to minors. Plaintiffs contend that the Georgia General Assembly's combination of these three sections into a single legislative Act violates the prohibition contained in Ga. Const. art. III, § V, ¶ III that "[n]o bill shall pass which refers to more than one subject matter or contains matter different from what is expressed in the title thereof."

Defendants respond that this is obviously a pure question of state law, the resolution

of which might make it unnecessary to reach the federal constitutional issues. Hence, defendants conclude, this Court should abstain and give the state courts an opportunity to render an authoritative decision on the state constitutional issue.

■■■ Opposing abstention on this ground, plaintiffs cite language from the Eleventh Circuit's recent decision in *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983), indicating that abstention should not be viewed "as a tool merely to abstract from the state courts an alternative state law ground for the judgment." The *Duke* court, however, went on to state that such a use of abstention is inappropriate only "when state law is clear." *Id.* In the instant case, it is by no means clear that the challenged Act comports with the state constitutional provision regarding bills that refer to more than one subject matter.[3] Such a situation, where an unsettled question of state constitutional law may entirely moot plaintiffs' federal constitutional claims, presents a classic case for abstention.

Plaintiffs also cite the Supreme Court's recent decision in *Hawaii Housing Authority v. Midkiff*, —— U.S. ——, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), for the proposition that abstention is not required simply because interpretation of the state constitution may obviate resolution of the federal constitutional questions. *Midkiff*, however, involved a state constitutional provision that merely paralleled the federal constitutional provision at issue, and, as the Court there noted, "abstention is not required for interpretation of parallel state constitutional provisions." 104 S.Ct. at 2327 n. 4 (citations omitted).

---

**3.** Apparently, Section 3 of the Act was added as a floor amendment late in the legislative process, *see* Plaintiffs' Trial Brief at 85, and plaintiffs contend that many legislators who questioned the constitutionality of the amendment were nevertheless reluctant to vote against the bill because of the presence of the other two sections dealing with child molestation. If established, these facts clearly would support an argument that the Act runs afoul of one of the two primary purposes of the constitutional pro-

scription, *viz.*, "the prevention of 'omnibus' bills combining many matters, adverse in their nature, with the view of combining in their favor the advocates of all and thus securing the passage of several measures no one of which could succeed upon its own merits." *Camp v. Metropolitan Atlanta Rapid Transit Authority*, 229 Ga. 35, 38, 189 S.E.2d 56 (1972); *see also Wall v. Board of Elections*, 242 Ga. 566, 569, 250 S.E.2d 408 (1978).

Where, on the other hand, the case may turn on the interpretation of some specialized state constitutional provision, abstention is appropriate. *Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 84–85, 95 S.Ct. 870, 874–875, 43 L.Ed.2d 32 (1975); *Reetz v. Bozanich,* 397 U.S. 82, 87, 90 S.Ct. 788, 790, 25 L.Ed.2d 68 (1970). The state constitutional provision at issue in the instant case is obviously a specialized provision that has no parallel in the federal Constitution. It appears to the Ccurt, therefore, that this is an appropriate situation for *Pullman*-type abstention.

In a final effort to avoid abstention on the basis of the state constitutional issue, plaintiffs have purported to "withdraw" Count VII of their complaint. Plaintiffs' Post-Trial Brief at 5 n. 1. At this stage of the proceedings, however, such an alteration of plaintiffs' claims can be accomplished only by order of the Court in response to an appropriate motion filed pursuant to either Rule 15(a) or Rule 41(a)(2), Fed.R.Civ.P. In any event, even if the Court permitted withdrawal of Count VII, that would not significantly alter the abstention question. It is true that withdrawal of Count VII would eliminate the need for this Court to rule on the state constitutional issue. Nevertheless, should plaintiffs not prevail on their federal claims in this Court, they would remain free to reassert the state constitutional claim in state court and, if successful, to render nugatory this Court's determination of the federal constitutional issues. It is precisely the possibility of such "premature constitutional adjudication[s]" that the abstention doctrine is designed to avoid. *Pullman, supra,* 312 U.S. at 500, 61 S.Ct. at 645.

Accordingly, the Court concludes that it should abstain from deciding the merits of plaintiffs' federal claims, while plaintiffs seek an authoritative ruling from the state courts on the challenged Act's constitutionality under Article III, Section V, Paragraph III of the Georgia Constitution.

### B. *Possibility of a Constitutional Construction of the Act*

■ Since the Court has already determined that abstention is appropriate on the basis of the state constitutional issue alone, it need not also decide whether the provisions of the Act that plaintiffs contend are violative of the federal Constitution are sufficiently susceptible of a constitutional construction by the state courts to provide an independent basis for abstention. However, since the Court has decided to remit plaintiffs to the state courts for a determination of the state constitutional issue, the interests of judicial economy dictate that plaintiffs at the same time seek a construction of the challenged portions of the Act in the light of their federal constitutional claims.

■ Although plaintiffs vigorously argue that no constitutional construction of Section 3 of the Act is possible, in this Court's view the Georgia courts might construe some or all of the challenged portions of the Act in such a way as to eliminate or substantially modify the federal constitutional claims raised by plaintiffs. Even if the possibility of such a construction is only slight, since abstention is appropriate in any event on the basis of plaintiffs' state constitutional claim, the state courts should at least be given an opportunity to construe the statute in the light of the federal constitutional issues raised by plaintiffs. If the Georgia courts decline or fail to provide a constitutional construction of the Act, then plaintiffs will be in no worse position than if they had not sought such a construction.[4]

**4.** The Court is aware of the possible difficulties in obtaining a construction of the challenged Act in a declaratory judgment action. The Georgia courts may find that in the present circumstances there is no justiciable controversy calling for the invocation of a declaratory judgment action, *see, e.g., City of Nashville v. Snow,* 204 Ga. 371, 49 S.E.2d 808 (1948), or they may decline to entertain a declaratory judgment action seeking construction of the Act on the grounds that such a declaration would be in effect an advisory opinion to this Court. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Hillhouse,* 131 Ga.App. 524, 206 S.E.2d 627 (1974). In the absence of the state constitutional issue, which forms an independent basis for abstention, the

IV. *Interim Relief*

[8] Plaintiffs have argued vigorously in opposition to abstention on the grounds that the inevitable delay in obtaining a final resolution of their claims will result in irreparable harm to their first amendment interests. The Supreme Court has noted that the abstention doctrine should be cautiously applied in the first amendment context:

> These principles [limiting abstention] have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment. In such case to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect.

*Zwickler v. Koota,* 389 U.S. 241, 252, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967); *see also Cate v. Oldham,* 707 F.2d 1176, 1184 (11th Cir.1983).

Nevertheless, abstention is not always inappropriate where first amendment issues are raised. In *Harrison v. NAACP,* 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), the Supreme Court ordered abstention on the question of the constitutionality of several Virginia statutes that had been challenged, *inter alia,* on first amendment grounds, because the statutes had not yet been interpreted by the state courts and were, in the Court's view, fairly susceptible to a constitutional construction. At the same time, however, the Court recognized that enforcement of the challenged statutes during the pendency of state court proceedings could jeopardize the NAACP's first amendment rights and cause "great and immediate irreparable injury." 360 U.S. at 178, 79 S.Ct. at 1031. This factor did not weigh in the abstention decision

because the state had assured the Court that it would not prosecute under the statutes until a final decision was reached as to their constitutionality. Even absent such assurances, however, or in the event they were not honored by the state, the Court noted that "the District Court of course possesses ample authority in this action, or in such supplemental proceedings as may be initiated, to protect the [NAACP] while this case goes forward." 360 U.S. at 179, 79 S.Ct. at 1031.

More recently, the Supreme Court again ordered a district court to abstain where certain provisions of a state statute challenged on first amendment grounds were found to be susceptible to constitutional construction. *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 306–312, 99 S.Ct. 2301, 2312–2316, 60 L.Ed.2d 895 (1979). There also the Court recognized the possibility of granting plaintiffs interim relief against enforcement of the challenged statute in order to mitigate the impact of abstention on their pursuit of constitutionally protected activities. 442 U.S. at 312 n. 18, 99 S.Ct. at 2316 n. 18. It left the question of the propriety of such relief to the district court on remand. *Id.*

■ Hence, in cases where abstention is otherwise indicated under the *Pullman* doctrine, but where plaintiffs will suffer irreparable harm if the challenged law is enforced while state law questions are litigated in state court, the district court retains the power to grant whatever interim relief is necessary to protect plaintiffs during the period of abstention. In the instant case, the Court believes that plaintiffs' concerns that the delay entailed by abstention will result in a serious chilling effect on their exercise of first amendment rights can be adequately addressed by consider-

possible inadequacy of state remedies would counsel against abstention in the instant case. However, the Court is convinced that a state declaratory judgment action does at least provide an adequate means for litigation of plaintiffs' state constitutional claim, since as to this claim it would appear that a justiciable controversy exists between the parties, and the state court's decision would not be merely advisory

but could be dispositive of the entire case. Moreover, as to the availability of a state court construction or limiting interpretation of the challenged statute, this Court will not assume that the Georgia courts "will not do their full duty in judging [this] statute[ ] in light of state and federal constitutional requirements." *Harrison v. NAACP,* 360 U.S. 167, 178, 79 S.Ct. 1025, 1031, 3 L.Ed.2d 1152 (1959).

ing the propriety of such interim relief. In this way, the interests underlying the abstention doctrine will be protected, but at the same time the principle that federal courts bear primary responsibility for the protection of federal rights also will be upheld.

■ The decision whether interim relief is appropriate will turn on the traditional factors that are weighed in any case where a preliminary injunction is sought: (1) whether plaintiffs have a substantial likelihood of success on the merits, (2) whether plaintiffs will suffer irreparable injury unless the relief is granted, (3) whether the threatened injury to plaintiffs outweighs whatever damage the proposed injunction may cause defendants, and (4) whether the relief, if granted, would be in the public interest.[5] *See, e.g., Shatel Corp. v. Mao Ta Lumber and Yacht Corp.,* 697 F.2d 1352, 1354–55 (11th Cir.1983).

■ In addition, another factor unique to abstention cases must be taken into account. As one commentator has noted, insofar as the decision to grant interim relief rests in part on a preliminary evaluation by the Court of the merits of plaintiffs' case, it may conflict to some extent with the abstention interests in avoiding unnecessary constitutional decisionmaking and having state courts decide issues of state law. *See* Wells, *Preliminary Injunctions and Abstention: Some Problems in Federalism,* 63 Cornell L.Rev. 65, 88–89 (1977). Accordingly, a court considering interim relief in an abstention case should assiduously avoid any unnecessary comment on the merits of plaintiffs' claims, since any preliminary ruling on the merits "might be perceived by the state court as an attempt to force it to decide state law questions in accordance with the federal court's intimations." *Id.* at 69.

■ The Court should look first to the comparative injuries of the parties. Where the balance of harms is tilted heavily in favor of plaintiffs, then the court may grant interim relief without determining the likelihood of plaintiffs' success on the merits, as long as plaintiffs have raised substantial questions presenting fair grounds for litigation. *See generally* 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2948 at 453–54 (1973 & Supp.1984) and cases cited therein. Where, on the other hand, the balance of harms tips decidedly toward defendants, interim relief will be justified only if the court can be practically certain that plaintiffs will prevail on the merits, and plaintiffs also will suffer at least some significant harm in the absence of such relief.

■ Furthermore, where more than one provision of state law is being challenged, the court should, so far as possible, consider the propriety of interim relief with respect to each provision separately. In this way, relief may be narrowly tailored to avoid unnecessary interference with the state program but at the same time adequately protect plaintiffs from enforcement of specific provisions of the law that will result in irreparable harm.

■ The question of which provisions of a challenged act may be treated separately for purposes of interim relief is similar, but not identical, to the issue of the ultimate severability of the statute's various provisions. Generally, "[t]he controlling inquiry in matters of severance is whether the legislature intended the offensive statutory provision to be an integral part of the statutory enactment viewed in its entirety." *Scheinberg v. Smith,* 659 F.2d 476, 481 (5th Cir. Unit B 1981). Legislative intent, however, should be only a secondary consideration in the interim relief context, since the decision is only preliminary and the relief to be granted only

5. In the instant case, the public interest is represented in part by plaintiffs' concerns for the preservation of first amendment freedoms but also in part by defendants' efforts to uphold the state's legitimate interest in protecting minors from certain harmful materials. Accordingly,

in balancing the respective injuries to plaintiffs and defendants, the Court also is weighing the effect of interim relief on the public interest, and the Court therefore will not address the public interest factor separately.

temporary. Accordingly, so long as a discrete provision of a challenged act may be given legal effect standing alone, and it does not plainly appear that its separate enforcement would be wholly contrary to the intent of the state legislature, the provision should be viewed separately for purposes of determining the propriety of interim relief during the period of abstention.

In the instant case, the challenged statute may be analyzed into five components: (1) the *definition* component, § 16–12–102, which defines the kind of materials that are deemed "harmful to minors" and are subject to the proscriptions set forth in the following sections; (2) the *distribution* component, § 16–12–103(a), which prohibits any person from selling or otherwise furnishing to a minor any material that is harmful to minors; (3) the *exhibition* component, § 16–12–103(b), which prohibits any person from exhibiting to a minor any motion picture, show, or other presentation that is harmful to minors; (4) the *display* component, § 16–12–103(e), which prohibits the display in public places where minors may be present of material that is harmful to minors; and (5) the *exemption* component, § 16–12–104, which exempts certain libraries from coverage under the Act.[6]

■ With respect to these five components, interim relief could not be afforded separately as to either the definition or the exemption provisions without enjoining enforcement of the entire statute. The substantive prohibitions of § 16–12–103 derive their meaning from the definitions supplied in § 16–12–102, and without recourse to these definitions the substantive provisions could not be given legal effect. Likewise, interim injunctive relief could not be granted separately as to the exemption provisions in § 16–12–104, because to do so would expose the exempted libraries to criminal liability under the statute, which would clearly be contrary to the express intent of the Georgia legislature.

As to the remaining components—the provisions regarding distribution, exhibition, and display of materials harmful to minors—the Court finds that each may be addressed separately on the issue of interim relief. Although the legislature obviously intended to prohibit *all* of these modes of dissemination of harmful materials, it would not be plainly contrary to that intent to treat each proscription separately for the purposes of interim relief. If the Court finds that enforcement of only one of the prohibitions is likely to cause plaintiffs irreparable harm, it certainly would not appear contrary to the legislative intent to permit enforcement of the remaining provisions.

■ Accordingly, the Court first will examine plaintiffs' challenges to §§ 16–12–102 and 16–12–104 (the definition and exemption components, respectively) to determine whether plaintiffs' likelihood of success and the balance of harms as to these claims justifies interim injunctive relief against enforcement of the entire statute. If not, then the Court will consider whether interim relief is appropriate as to one or more of the substantive prohibitions contained in § 16–12–103(a), (b), and (e) (the distribution, exhibition, and display components, respectively).

## A. *Definition* (§ 16–12–102)

Section 16–12–102 of the new law is the focus of attack on grounds of both overbreadth and vagueness.[7] Comparing the

---

**6.** The only other provisions of the challenged law are subsections (c) and (d) of § 16–12–103, *see* Appendix, which prohibit, respectively, (1) any minor from falsely representing himself as an adult in order to obtain material that is harmful to minors, and (2) any adult from falsely representing that he is the parent or guardian of a minor, or that such minor is actually an adult, in order to obtain for the minor any material that is harmful to minors. Plaintiffs have not challenged the validity of either of these two subsections.

**7.** On the basis of the alleged overbreadth and vagueness of this and other sections of the Act, plaintiffs also contend that the Act creates an impermissible prior restraint on free speech. Since, however, the prior restraint issue ultimately turns on the questions of overbreadth and vagueness, *see, e.g., M.S. News Co. v. Casado,* 721 F.2d 1281, 1292–93 (10th Cir.1983), the

harm to plaintiffs if interim relief is denied on these claims with the harm to defendants if such relief is granted, the Court finds the balance of harms does not tip decidedly in favor of either side. If relief is denied, plaintiffs may suffer irreparable injury to first amendment freedoms. At the same time, if relief is granted, enforcement of the entire statute must be enjoined, and the state's legitimate interest in protecting minors from certain harmful material would be completely frustrated. Since the likely harm to the parties is thus fairly evenly balanced, the Court must consider plaintiffs' likelihood of success on the merits of their claims in order to determine the propriety of interim relief.

Plaintiffs contend that the Act's definition of proscribed materials is unconstitutionally overbroad in that it includes within its scope materials that are not obscene as to at least some minors. The first ground of plaintiffs' overbreadth attack is that § 16–12–102(1) of the new law does not require materials to be "taken as a whole" when applying each of the three parts of the definition of "harmful to minors." The current law applies the "taken as a whole" standard to all three parts of the test, but the new law would incorporate the standard only into the first and third, but not the second, parts of the test. *See* Appendix § 16–12–102(1)(A), (B), and (C). The Court, however, cannot agree that plaintiffs are likely to succeed on their claim

that this amendment to the current law unconstitutionally broadens its scope.

The definition of "harmful to minors" in the current Georgia law, as well as in the challenged Act, is based directly on the definition contained in the New York statute upheld by the Supreme Court in *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), as modified in light of the new three-part test of obscenity announced by the Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).[8] The *Miller* obscenity test itself does not incorporate the "taken as a whole" standard into the second part of the test.[9] The Court concludes that plaintiffs are not sufficiently likely to succeed on this aspect of their overbreadth argument to justify interim relief.

Plaintiffs next argue that the statute is overbroad because it applies a single standard to all persons less than 18 years of age and thus unconstitutionally infringes on the first amendment rights of older, more mature minors, who are "possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Ginsberg, supra*, 390 U.S. at 649–50, 88 S.Ct. at 1286 (Stewart, J., concurring). First of all, the Court cannot accept plaintiffs' premise that a single standard for all minors necessarily results in a standard "restricting the older adolescent to reading or viewing only that which is appropriate for the very young or immature child."[10] Plaintiffs' Trial Brief at 41.

Court will focus on these questions and will not address separately the prior restraint argument.

**8.** The *Ginsberg* test for materials "harmful to minors" was based on the then prevailing test for adult obscenity derived from *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (plurality opinion). The Supreme Court has not resolved the question of the effect of *Miller* on the *Ginsberg* formulation, *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 n. 10, 95 S.Ct. 2268, 2275 n. 10, 45 L.Ed.2d 125 (1975); however, the Tenth Circuit has recently upheld a local ordinance containing a similar modification of the *Ginsberg* test in light of *Miller*. *M.S. News Co. v. Casado*, 721 F.2d 1281, 1286–87 (10th Cir.1983).

**9.** *See Miller, supra*, 413 U.S. at 24, 93 S.Ct. at 2615: "A state offense must ... be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value."

**10.** The Court notes that a single standard of obscenity also is applicable to all adults, but the Court is not aware of any serious argument that such a standard is overbroad because it relegates more mature adults to reading or viewing only those materials that are appropriate for immature nineteen-year-olds. *Cf. Roth v. United States*, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957) (adult obscenity gauged by reaction of "the average person"); *see also Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973).

In any event, notwithstanding such a unitary standard of "harmfulness," the Supreme Court in *Ginsberg, supra,* inquiring "whether it was constitutionally impermissible for New York ... to accord minors under 17 a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see," concluded that "we cannot say that the statute invades the area of freedom of expression constitutionally secured to minors." 390 U.S. at 636–37, 88 S.Ct. at 1279 (footnote omitted). In light of *Ginsberg,* and in the absence of any case cited by plaintiffs holding that a unitary standard of obscenity for minors is unconstitutionally overbroad, the Court concludes that plaintiffs have not demonstrated a sufficient likelihood of success on the merits of this aspect of their overbreadth claim to justify interim relief.

Finally, plaintiffs attack § 16–12–102 on vagueness grounds, contending that "[t]he Act lacks a constitutional standard by which the proscribed material can be determined." Complaint ¶ 16. However, in *Ginsberg, supra,* the Supreme Court upheld an almost identical definition of "harmful to minors" against such a vagueness challenge. 390 U.S. at 643. Plaintiffs have not cited any material respect in which the definition of proscribed materials contained in § 16–12–102 differs from that upheld in *Ginsberg.* Accordingly, the Court finds that plaintiffs have failed to show a sufficient likelihood of success on the merits of this claim to justify interim relief.

### B. *Exemption* (§ 16–12–104)

Plaintiffs challenge the exemption provisions of § 16–12–104 on both equal protection and vagueness grounds. The Court, however, finds that it need not consider the merits of these claims at this time, because there is no showing that plaintiffs will suffer any irreparable harm as a result of the exemption of certain libraries from coverage under the statute. There is therefore no need for interim relief as to these claims.

### C. *Distribution* (§ 16–12–103(a))

Plaintiffs challenge § 16–12–103(a) on the grounds that it is unconstitutionally overbroad and that it unconstitutionally infringes on parents' rights to rear their children free from state interference. The overbreadth claim is based on the elimination of "taken as a whole" from the language of § 16–12–103(a)(1), which plaintiffs contend results in the proscription of material that is constitutionally protected even as to minors. The second claim is based on the addition of the phrase "or otherwise furnish or disseminate" to the general prohibitory language of the section, which plaintiffs contend would prevent even parents from providing proscribed materials to their minor children, in violation of the parents' rights under the fourteenth amendment to direct their children's upbringing and education.

As to the alleged infringement of parents' rights, the Court must first consider whether plaintiffs have standing to assert this claim. Only one of the plaintiffs in this action is an individual, and he has not alleged that he is the parent of any minor children. Plaintiffs, however, rely on *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), to support their standing on this issue.

In *Pierce* two private educational institutions, a Catholic parochial school and a military academy, successfully challenged the constitutionality of an Oregon statute requiring parents to send their minor children to public schools. Although the Court based its holding on the rights of parents, who were not parties to the action, to control their children's education, 268 U.S. at 534–35, 45 S.Ct. at 473–74, it recognized the private institutions' right to challenge the law because of the irreparable economic injury that its enforcement would cause them:

Appellees are corporations, and therefore, it is said, they cannot claim for themselves the liberty which the Fourteenth Amendment guarantees. Accept-

ed in the proper sense, this is true. [Citations omitted.] But they have business and property for which they claim protection. These are threatened with destruction through the unwarranted compulsion which appellants are exercising over present and prospective patrons of their schools. And this court has gone very far to protect against loss threatened by such action. [Citations omitted.]

....

Generally, it is entirely true, as urged by counsel, that no person in any business has such an interest in possible customers as to enable him to restrain exercise of proper power of the state upon the ground that he will be deprived of patronage. But the injunctions here sought are not against the exercise of any proper power. Appellees asked protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property. Their interest is clear and immediate....

268 U.S. at 535–36, 45 S.Ct. at 573–74.

■ Relying on *Pierce*, plaintiffs in the instant case apparently argue that if the challenged Act is enforced against parents, they will suffer irreparable economic injury from the loss of such parents' patronage. However, assuming without deciding that the economic injury suffered by plaintiffs would be sufficient to meet standing requirements, the Court finds no showing by plaintiffs that such injury would be sufficiently great to justify the issuance of interim injunctive relief at this stage of these proceedings. While potential economic loss that threatens a plaintiff's entire business may constitute irreparable injury for purposes of injunctive relief, *see Rhodes v. Gwinnett County, Georgia*, 557 F.Supp. 30, 33 n. 9 (N.D.Ga.1982), plaintiffs here have not established that any significant portion of their business would consist in selling parents materials covered by the challenged law for use by their minor chil-

dren. Since plaintiffs have failed to demonstrate the requisite irreparable harm with respect to this claim, the Court concludes that interim injunctive relief would be inappropriate.[11]

■ Turning to plaintiffs' overbreadth challenge to § 16–12–103(a), the Court reaches the merits of this claim because once again the potential harm to plaintiffs' first amendment rights and to the state's legitimate enforcement interests appear relatively evenly balanced. Plaintiffs argue that striking the phrase "taken as a whole" from § 16–12–103(a)(1) renders the scope of that subsection unconstitutionally overbroad. However, contrary to plaintiffs' arguments, the requisite "taken as a whole" standard is retained in subsection (1) by virtue of the requirement that the covered materials be "harmful to minors." As has already been noted, *supra* at 687–688, the Act's definition of "harmful to minors" incorporates the "taken as a whole" standard in conformity with the *Miller* test of obscenity. It would not appear necessary, therefore, that the specification of proscribed materials include both the words "taken as a whole" and "harmful to minors." Accordingly, the Court concludes that plaintiffs are not sufficiently likely to prevail on the merits of this claim to justify interim relief.

D. *Exhibition* (§ 16–12–103(b))

Plaintiffs challenge § 16–12–103(b) on grounds of overbreadth, vagueness, and infringement of parents' rights to rear their children free from state interference. The claim based on parents' rights is identical to that raised against § 16–12–103(a), discussed *supra* at 689–690, and for the same reasons stated there the Court concludes that interim relief is not appropriate on the basis of this claim. As with plaintiffs' other vagueness and overbreadth claims, the threatened harm to plaintiffs' first amendment rights and to the state's

---

11. The Court's conclusion is buttressed by defendants' express disavowal of any interpretation of the challenged law as applicable to parents or guardians. Defendants' Trial Brief at

30–31. Given their interpretation, defendants presumably will not seek to enforce the law against a parent or guardian who provides proscribed materials to his minor children.

legitimate enforcement interests are fairly evenly balanced; therefore, the Court must consider the merits of these claims to determine the need for interim relief.

■ Plaintiffs' overbreadth claim as to this subsection once again rests on the contention that the "taken as a whole" standard for judging materials has been removed, resulting in the prohibition of materials that are constitutionally protected even as to minors. Plaintiffs focus on the legislature's removal of the "taken as a whole" language from the current law and insertion of the phrase "in whole or in part," so that the new law would proscribe exhibition to a minor of "a motion picture, show, or other presentation which, in whole or in part, depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors." *See* Appendix § 16–12–103(b). The Court, however, cannot agree that this new language must be construed as rejecting the "taken as a whole" standard. First of all, the added· phrase "in whole or in part" is not inconsistent with the "taken as a whole" standard. The fact that works may be proscribed which only partly contain "sexually explicit nudity, sexual conduct, or sadomasochistic abuse" does not imply that the works are not still to be judged "as a whole." Second, the "taken as a whole" standard is in fact incorporated into this subsection by the requirement that proscribed materials meet the definition of "harmful to minors." *See* discussion *supra* ·at 687–688, 690–691. Accordingly, the Court concludes that plaintiffs have not demonstrated a sufficient likelihood of success on this claim to justify interim relief. ·

■ Plaintiffs also challenge on overbreadth grounds the language in the new law that prohibits the exhibition of covered films "at any such premises which are not designed to prevent viewing from any public way of such motion picture by minors not admitted to any such premises." *See* Appendix § 16–12–103(b). Plaintiffs analogize this provision to the municipal ordinance struck down by the Supreme Court on overbreadth grounds in *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). The Jacksonville ordinance, however, "sweepingly for[bade] display of all films containing *any* ·uncovered buttocks or breasts, irrespective of context or pervasiveness," 422 U.S. at 213, 95 S.Ct. at 2274 (emphasis in original), and thus prohibited exhibition of films that could not be deemed obscene even as to minors under the *Ginsberg* formulation. *Id.* The Court suggested that if a narrowing-construction limiting the ordinance to films that were obscene as to minors were possible, then its facial validity would be upheld. 422 U.S. at 216 & n. 15, 95 S.Ct. at 2276 & n. 15. Since the statute challenged by plaintiffs here, unlike the Jacksonville ordinance in *Erznoznik,* may be construed as limited to materials that are obscene as to minors, the Court concludes that plaintiffs have not demonstrated a sufficient likelihood of success on the merits of this claim to justify interim relief.

■ Finally, plaintiffs' vagueness argument focuses on the ambiguity of the word "premises". Subsection 16–12–103(b) makes it unlawful "for any person knowingly to sell or furnish to a minor an admission ticket or pass or knowingly to admit a minor to premises whereon there is exhibited a motion picture, show, or other presentation" that is proscribed under the Act. Plaintiffs raise the following question: "Would the owner of a multi-screen theatre be in violation of the Act if he sold a ticket to a minor to see a movie which is not in violation of the Act, knowing that there also is being exhibited on his premises a movie which is in violation of the Act?" Plaintiffs' Trial Brief at 51. Although there may be some uncertainty here, it is within such a narrow range that it is doubtful whether the vagueness rises to the level of a due process violation. *See Roth v. United States,* 354 U.S. 476, 491–92, 77 S.Ct. 1304, 1312–13, 1 L.Ed.2d 1498 (1957). Accordingly, the Court concludes that plaintiffs have failed to demonstrate a sufficient likelihood of success on the merits

of their vagueness challenge to this subsection to justify interim relief.

### E. *Display* (§ 16–12–103(e))

 Plaintiffs attack the display provision of the new law on grounds of overbreadth and vagueness. As to these claims, the Court finds that the likely harm to plaintiffs if interim relief is denied substantially outweighs the harm to defendants if enforcement of these provisions is temporarily enjoined during the period of abstention.

The testimony at trial showed that some retailers interpreted the display provisions of the Act as providing them with only two possible avenues of compliance. First, the retailer who wished to maintain on his shelves materials that might be covered by the Act could simply exclude all minors from the premises. Alternatively, the retailer could remove from his shelves all materials he believed might run afoul of the law. Given the wide range of materials that some retailers would judge to fall within the scope of the Act,[12] it is clear that either alternative would result in significant economic loss to retailers, as well as to publishers and authors, and would significantly restrict the access of both minors and adults to communicative materials of all kinds. The Court concludes that enforcement of the display provisions prior

to a possible narrowing interpretation of the Act by the Georgia courts would result in immediate, irreparable injury to the first amendment rights of both plaintiffs and others.

The harm to the state, on the other hand, should enforcement of these provisions be temporarily enjoined, while not insignificant, would be substantially less serious. It is true that the state's legitimate interest in protecting minors from harmful materials would be temporarily frustrated in part. However, the state's effort to regulate such materials would remain unimpaired with regard to the prohibition of distribution and exhibition of such materials pursuant to § 16–12–103(a) and (b).[13] Given that a substantial portion of the state regulatory program would remain in effect, and that plaintiffs are threatened with irreparable injury absent some interim relief from enforcement of the Act's display provisions, the Court concludes that the balance of harms is tilted decidedly in favor of plaintiffs as to these claims. Accordingly, so long as plaintiffs have raised substantial questions presenting fair grounds for litigation, interim relief as to the Act's display provisions will be appropriate.

Turning to the merits of plaintiffs' claims, the Court finds that plaintiffs have raised substantial constitutional questions

---

**12.** The evidence at trial established that, for all practical purposes, it would be impossible for retailers to review the contents of books, periodicals, and other materials, either before or after purchasing them, in order to determine which materials might be harmful to minors within the meaning of the statute. Because of the large number of items ordered and on hand in bookstores, it is not possible for the retailer to read or even to review the contents of each particular item before placing it on display and offering it for sale. Accordingly, a retailer's judgment regarding what might be harmful to minors must be categorical in nature, *i.e.,* based upon the general subject matter of the material or the reputation of the author. Testimony showed that, in exercising such judgment, retailers would conclude that a very wide range of materials is covered by the new law, including many new works of fiction appearing on both local and national best-seller lists, as well as recognized literary classics, photography and art books, and books on sex education. *See gener-*

*ally* Plaintiffs' Trial Exhibits 2–16. Although defendants disavow any intention to enforce the new law with respect to materials of the type cited by plaintiffs, *cf.* Defendants' Trial Exhibits 1–20 (relatively narrow range of sexually explicit magazines and books which defendants contend are encompassed by the Act's definition of "harmful to minors"), the Court finds that retailers, in an effort to minimize the possibility of arrest and prosecution, would err on the side of caution and treat all materials that are even arguably within the scope of the Act as being covered.

**13.** The Court's entry of an order temporarily enjoining enforcement of certain provisions of the Act would not, of course, otherwise prevent the Act's becoming fully effective and enforceable on July 1, 1984, as provided under state law. Only enforcement of the specific provisions covered by the Court's injunction would be prohibited.

as to both overbreadth and vagueness of the Act's display provisions. First, as to overbreadth, it is well settled that legislation whose purpose is to protect minors from exposure to sexually oriented material will be stricken as overbroad when it unnecessarily restricts adults' access to the material. *Butler v. Michigan*, 352 U.S. 380, 383–84, 77 S.Ct. 524, 525–26, 1 L.Ed.2d 412 (1957). It is undisputed that some of the materials deemed harmful to minors under the new Georgia law are constitutionally protected as to adults, and plaintiffs clearly have raised substantial questions as to whether the display provisions of the Act unnecessarily restrict adults' access to these protected materials. *See* note 12 *supra* and accompanying text.

Plaintiffs have also raised substantial questions as to the vagueness of the Act's display provisions. It is unclear, for example, what may constitute a "display" of materials under the Act, or what might qualify as a "public place frequented by minors." Although the Georgia courts may eliminate any vagueness by means of a definitive, narrowing interpretation, prior to any such interpretation, the Court must find that plaintiffs have raised sufficient vagueness concerns to justify temporary interim relief.

Accordingly, having found that plaintiffs have raised substantial questions presenting fair grounds for litigation as to the constitutionality of the Act's display provisions, the Court concludes that interim injunctive relief preventing the enforcement of these provisions is appropriate. The Court, however, must still address plaintiffs' concerns that the scope of such an injunction will be inadequate to provide the necessary relief.

### F. *Scope of Relief*

Plaintiffs have argued that interim injunctive relief will be inadequate to protect the first amendment interests at stake, because the injunction will not have state-wide effect but will operate only against the defendants currently before the Court. Plaintiffs' Post-Trial Brief at 9. However, pursuant to Fed.R.Civ.P. 65(d), this Court's injunction will be binding upon defendants, "their officers, agents, servants, employees, and attorneys, *and upon those persons in active concert or participation with them* who receive actual notice of the order by personal service or otherwise." (Emphasis added.) The persons encompassed within the emphasized language include those "so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding." 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2956 at 560 (1973).

In the instant case, the Attorney General of Georgia, although not named as a party, was served with a copy of the proceeding and entered an appearance through counsel to argue in support of the challenged Act's constitutionality. *See* note 2 *supra*. Under these circumstances, the Court concludes that the Attorney General is "so identified in interest" with the named defendants that he will be bound by the Court's injunction as a "person[ ] in active concert or participation with" defendants.

Likewise, the Attorney General's appearance in this case clearly served to represent the rights and interests of other subordinate state law enforcement officials, not named as parties to this action, who might seek to enforce the challenged Act. Accordingly, these state law enforcement officials also will be bound by the Court's injunction, and plaintiffs will thus enjoy state-wide interim relief from enforcement of the Act's display provisions.

### V. *Conclusion*

For the foregoing reasons, defendants' motion to abstain is GRANTED. Pursuant to the procedures set out in *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), and *Government and Civic Employees Organizing Committee, CIO v. Windsor*, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), plaintiffs should proceed to the Georgia courts for a determina-

tion of their state constitutional claim, as well as a construction of the challenged portions of the Act in the light of their federal constitutional claims.

█ Although plaintiffs, of course, are free to litigate both state and federal issues in the state courts, they may preserve their right to return to this Court by making on the state record a reservation to the disposition of the entire case by the state courts. *England, supra,* 375 U.S. at 421, 84 S.Ct. at 467. Then, should the state courts hold against plaintiffs on the state law questions, they may return to this Court for disposition of their federal claims.

█ Until the Georgia courts have been afforded an opportunity to determine the state law issues as set out above, all further proceedings in this action are STAYED. This Court will retain jurisdiction pending determination of the issues of state law in the Georgia courts, or until efforts to obtain such a determination have been exhausted. *See American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973).

In the interim, defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert and participation with them, including the Attorney General of Georgia and all other subordinate state law enforcement officials, who receive actual notice of this order by personal service or otherwise, are hereby ENJOINED until further order of this Court, from enforcing or attempting to enforce O.C.G.A. § 16–12–103(e), which appears in Section 3 of Act No. 1319, 1984 Ga.Laws 1495, 1496–1501, *approved* April 5, 1984, *to take effect* July 1, 1984.

In sum, the Court (1) ABSTAINS from deciding the claims asserted by plaintiffs, (2) STAYS all further proceedings in this action pending determination of state law issues in the Georgia courts or exhaustion of efforts to obtain such a determination, and (3) in the interim, ENJOINS enforcement of the display provisions of the chal-

lenged Act as more specifically set out herein.

## APPENDIX

New Code sections 16–12–102 through 16–12–104 amend the current Georgia law as follows:

16–12–102. As used in this part, the term:

(1) 'Harmful to minors' means that quality of ~~any~~ description or representation, in whatever form, of ~~sexually explicit~~ nudity, sexual conduct, sexual excitement, ~~bestiality,~~ or sadomasochistic abuse, when ~~taken as a whole~~ it:

(A) <u>Taken as a whole,</u> predominantly appeals to the prurient, shameful, or morbid interest of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(C) ~~Lacks~~ <u>Is, when taken as a whole, lacking in</u> serious literary, artistic, political, or scientific value <u>for minors.</u>

(2) 'Knowingly' means having *a* general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:

(A) The character and content of any material described in this part which is reasonably susceptible ~~of~~ <u>to</u> examination by the defendant; and

(B) The age of the minor; provided<u>,</u> <u>however,</u> that an honest mistake shall constitute an excuse from liability ~~under~~ <u>in</u> this part if the defendant made a reasonable, bona fide attempt to ascertain the true age of such minor.

(3) 'Minor' means a person ~~under the age of 16~~ <u>less than 18</u> years <u>of age.</u>

(4) 'Sadomasochistic abuse' means actual or simulated flagellation or torture by or upon a person <u>who is</u> nude, ~~or~~ clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound, or otherwise physically restrained ~~on the part of~~ <u>by</u> one so clothed or nude.

(5) 'Sexual conduct' means actual or simulated acts of masturbation, homosexuality, ~~bestiality,~~ sexual intercourse, or physi-

cal contact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person be a female, breasts.

(6) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(7) 'Sexually explicit nudity' means the showing of a state of undress so as to expose the human male or female genitals, pubic area, or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state.

16–12–103. (a) It shall be unlawful for any person knowingly to sell or loan for monetary consideration or otherwise furnish or disseminate to a minor:

(1) A Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1) of this Code subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.

16–12–104. (b) It shall be unlawful for any person knowingly to exhibit for a monetary consideration to a person under the age of 18 or knowingly to sell or furnish to a person under the age of 18 a minor an admission ticket or pass or knowingly to admit a person under the age of 18 minor for a monetary consideration to premises whereon there is exhibited a motion picture, show, or other presentation which, in whole or in part, depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors or exhibit any such motion picture at any such premises which are not designed to prevent viewing from any public way of such motion picture by minors not admitted to any such premises.

(c) It shall be unlawful for any minor falsely to represent to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that such minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(d) It shall be unlawful for any person knowingly to make a false representation to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that he is the parent or guardian of any minor or that any minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(e) It shall be unlawful for any person knowingly to exhibit, expose, or display in public at newsstands or any other business or commercial establishment or at any other public place frequented by minors or where minors are or may be invited as part of the general public:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in para-1(1) of this subsection, or explicit and detailed verbal

descriptions or narrative accounts of sexual excitement, sexual conduct, or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

16–12–104. The provisions of Code Section 16–12–103 shall not apply to any public library operated by the state or any of its political subdivisions nor to any library operated as a part of any school, college, or university.