AMERICAN BOOKSELLERS, et al.,
Plaintiffs–Appellees,

v.

James WEBB, et al.,
Defendants–Appellants.

No. 87–8199.

United States Court of Appeals,
Eleventh Circuit.

Dec. 27, 1990.

George M. Weaver, England, Weaver & Kytle, Atlanta, Ga., for defendants-appellants.

William N. Withrow, Jr., J. Kirk Quillian, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., Michael A. Bamberger, Sonnenschein, Carlin, Nath & Rosenthal, New York City, for plaintiffs-appellees.

Before KRAVITCH, Circuit Judge, HILL, Senior Circuit Judge *, and POINTER, Chief District Judge **.

---

* *See* Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Sam C. Pointer, Jr., Chief U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. The display ban implicates not only the right of adults to have access to material protected by the First Amendment, but also the interests of authors, publishers, booksellers, and others affected by a law regulating consumer access to books and other material covered by the statute. For the sake of brevity, we will refer throughout

HILL, Senior Circuit Judge:

## INTRODUCTION

### I. STATEMENT OF THE CASE

As stated in the district court order from which this appeal is taken, "[t]his case presents a conflict between one of society's most cherished rights—freedom of expression—and one of government's most profound obligations—the protection of minors." *American Booksellers Ass'n v. Webb*, 643 F.Supp. 1546, 1547 (N.D.Ga. 1986) (hereinafter "*Webb II*"). Plaintiff-appellees obtained declaratory and injunctive relief barring the enforcement of a Georgia law which regulates, *inter alia,* the display of material deemed "harmful to minors." The District Court for the Northern District of Georgia interpreted the statute to "reduce an adult's selection of reading materials to a book list suitable for a fifth-grade class" and declared the statute unconstitutional on its face. *Id.* at 1548. We find that the statute is readily susceptible to a narrowing construction that reduces the scope of materials covered, produces only a slight burden on adults' access to protected material,[1] and fully comports with the First Amendment. We also reverse the district court's determination that an exemption granted in the statute to libraries is subject to strict scrutiny and violates the Equal Protection Clause.

#### A. *Background*

On April 5, 1984, the Governor of Georgia signed into law Act No. 1319, 1984 Ga.Laws 1495, 1496–1501, which was to take effect on July 1, 1984. Section 3 of the Act, which is codified at O.C.G.A. §§ 16–12–102 to 16–12–104 (1988),[2] regu-

---

this opinion to "adults' access" as a shorthand expression denoting all of the interests affected by the statute.

2. The statutory provisions relevant to this appeal, O.C.G.A. §§ 16–12–102 to 16–12–104, are set forth in the Appendix to this opinion.

Sections 1 and 2 of the Act amended O.C.G.A. §§ 16–6–4 and 16–6–5, which relate to the criminal sexual offenses of, respectively, child molestation and enticing a child for indecent purposes.

lates the distribution and display of sexually explicit materials deemed "harmful to minors" under the definition provided in section 16–12–102.

It may be useful to analyze the challenged statutory provisions as a group of five distinct components: (1) the *definition* in section 16–12–102 of the type of materials deemed "harmful to minors" and subjected to the proscriptions set forth in section 16–12–103; (2) the ban in section 16–12–103(a) on the *distribution* (in this case, the sale or loan) to a minor of any material "harmful to minors"; (3) the ban in section 16–12–103(b) on the *exhibition* to a minor of any motion picture, show, or other presentation that is "harmful to minors"; (4) the prohibition in section 16–12–103(e) on the *display* in public places where minors may be present of material that is "harmful to minors"; and (5) in section 16–12–104, the exemption from coverage under the statute of certain libraries in the state of Georgia. *See American Booksellers Ass'n., v. Webb,* 590 F.Supp. 677, 687 (N.D. Ga.1984) (district court order to abstain and grant interim injunctive relief) (hereinafter *"Webb I"*) (describing the five component parts of the statute); *Hunter v. State,* 257 Ga. 571, 571–72, 361 S.E.2d 787, 787 (1987) (same).

The definition of "harmful to minors" in section 16–12–102 derives from a New York statute that the Supreme Court upheld in *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).[3] *Ginsberg* approved the use of a "variable obscenity standard," *see id.* at 636–39, 88

S.Ct. at 1278–80—an adaptation of the general standard for determining adult obscenity to reflect the "prevailing standards in the adult community as a whole with respect to what is suitable material for minors." *Id.* at 639, 88 S.Ct. at 1280 (quoting N.Y.Penal Law § 484–h).[4] Five years after the Court decided *Ginsberg,* it revised the standard for determining adult obscenity in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Section 16–12–102 modifies the *Ginsberg* test for determining material obscene as to minors in light of the three-part test articulated in *Miller* for determining adult obscenity.[5]

An accused must "knowingly" violate the statute's various proscriptions. *See* O.C. G.A. §§ 16–12–103(a), (b), and (e), and 16–12–102(2). Section 16–12–103(c) also makes it unlawful for any minor falsely to represent that he or she is 18 years of age or older with the intent to procure any material covered by the statute.

## B. Procedural History

### 1. The suit to enjoin.

Plaintiff-appellees are various associations of booksellers, publishers, periodical distributors, college bookstores, and retailers, as well as two general bookstores and an author.[6] On April 6, 1984, the day the Governor signed the bill into law, plaintiffs filed their complaint seeking declaratory and injunctive relief. The defendant-appellants are various Georgia solicitors, sheriffs, and police officials who have authority to enforce the law.[7]

---

Except where noted by the context, as used hereinafter in this opinion the terms "the Act," "the statute," or "the statutory provisions" will refer to sections 16–12–102 to 16–12–104.

3. The New York statute upheld in *Ginsberg* banned only the sale or distribution to minors of material "harmful to minors."

4. In general, material is not "harmful to minors" under the Georgia statute unless it (1) taken as a whole, appeals to the prurient interest of minors, (2) is patently offensive to standards in the adult community with regard to what is suitable for minors, and (3) taken as a whole, lacks serious value. *See* O.C.G.A. § 16–12–102(1).

5. For a more detailed discussion of the changes to the *Ginsberg* formulation wrought by *Miller,* see footnote 18.

6. *See Webb I,* 590 F.Supp. at 681 n. 1, and 689–90, for a discussion of plaintiffs' standing.

7. The Attorney General of Georgia is not named as a defendant, but was served with a copy of the proceedings pursuant to O.C.G.A. section 9–4–7(c) and retained a special assistant attorney general to act as lead counsel for most of the defendants. *See Webb I,* 590 F.Supp. at 681 n. 2. The district court determined that all state law enforcement officials are bound by the outcome of this case. *Id.* at 693.

Plaintiffs alleged that the statutory provisions in question violated the First, Fifth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.[8] Plaintiffs also alleged that the legislature's choice to include in a single enactment provisions relating to sexual offenses against children (Sections I and II of the Act, see footnote 2), together with provisions regulating material "harmful to minors" (Section III of the Act), violated Article III, Section V, Paragraph III of the Georgia Constitution—the rule against referring to more than one subject matter in the same bill.

Since the Act was not scheduled to become effective until July 1, 1984, see O.C.G.A. § 1–3–4(a) (governing effective date of legislative acts), the district court consolidated the hearing on plaintiff's motion for a preliminary injunction with a trial on the merits on May 31–June 1, 1984.

2. *Pullman* abstention and the certification of questions to the Georgia Supreme Court.

By order dated June 27, 1984, the district court granted defendant's motion to abstain under *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), until the Georgia courts decided whether the Act violated the "one subject matter" provision of the Georgia Constitution. The court did however grant temporary relief to plaintiffs by enjoining the display ban. *Webb I*, 590 F.Supp. at

693–94. In the interest of judicial economy, the court suggested that Appellants also seek a construction of the challenged provisions in the Georgia courts.

Plaintiffs appealed to this court, which granted the parties' joint motion to present two certified questions to the Georgia Supreme Court. *American Booksellers Ass'n v. Webb*, 744 F.2d 784 (11th Cir.1984).

The Georgia Supreme Court answered the first question by holding that the Act did not violate the "one subject matter" provision of the Georgia Constitution; but the court declined to construe O.C.G.A. §§ 16–12–102 to 16–12–104 in the absence of enforcement facts, finding instead that the challenge was anticipatory. *American Booksellers Ass'n v. Webb*, 254 Ga. 399, 329 S.E.2d 495 (1985).

3. The district court's decision on the merits.

On September 26, 1986, on the basis of the factual evidence and legal arguments presented at trial, the district court declared the display provision and library exemption of the statute unconstitutional. *Webb II*, 643 F.Supp. at 1556. The court ruled on February 25, 1987, that since the library exemption is not severable from the definition, distribution, exhibition, and display provisions, the entire statute is invalid. *American Booksellers Ass'n v. Webb*, 654 F.Supp. 503 (N.D.Ga.1987).[9] The court

---

**8.** Count I of the complaint alleged that the bans on distribution and display are unconstitutionally overbroad because they apply to materials that are not obscene as to minors. Count II alleged that the display provision violates adults' First Amendment right of access to materials that are not obscene as to them. Count III alleged that the statute effects an unconstitutional prior restraint on speech. Count IV alleged that the definition of "harmful to minors" contained in the statute is unconstitutionally vague. Count V alleged that the exemption for libraries violates the Equal Protection Clause. Count VI alleged that the statute violates a parent's right to raise his or her child free from state interference. Count VII is the state law count described in the text below. *See Webb I*, 590 F.Supp. at 682.

**9.** Proceedings in this court were stayed from February 8, 1988 until December 6, 1988, due to

the pendency of a case in the United States Supreme Court involving similar issues. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (certifying questions to the Virginia Supreme Court); 488 U.S. 905, 109 S.Ct. 254, 102 L.Ed.2d 243 (1988) (vacating earlier decision and remanding the case to the Fourth Circuit for reconsideration in light of the answers received). *See also American Booksellers Ass'n v. Virginia*, 882 F.2d 125 (4th Cir.1989) (upholding facial validity of display regulation as interpreted by Virginia Supreme Court).

Unfortunately, the final Fourth Circuit decision does not provide us substantial guidance. The 1.5 page opinion aids our analysis only in part. While it aids our construction of the Georgia statute's phrase "harmful to minors" (see below at page 1505), the opinion does not aid our analysis of the compliance strategies

nevertheless stayed that portion of its injunction involving the definition, distribution, and exhibition provisions of the statute pending this appeal.

### a. findings of fact

The district court found "that in-store display of books is the cornerstone of the [bookselling] industry's marketing practices. Relatively few books are advertised through the mass media, and, as a result, the vast majority of sales are impulsive selections prompted by a display." *Webb II*, 643 F.Supp. at 1549. The court also found as matter of fact that approximately 500,000 books are in print at any given time and 50,000 new books are published every year; therefore, booksellers "cannot hope to read more than a minimal percentage of books that they stock." *Id.* at 1550.

### b. conclusions of law

The court made various legal interpretations regarding the coverage of the statute's "harmful to minors" definition and thus the reach of the ban on display. Although several of its findings were noted as "findings of fact," *see id.* at 1549–51, the parties agree that "the district court's determinations as to the scope of the phrase 'harmful to minors,' and its specific applicability to particular works" are mixed questions of law and fact. Appellees' Brief at 11–12. *See* Appellants' Brief at 11.[10] The district court found that "a significant percentage of an average bookstore's inventory would be barred from display" by the statute, *id.* at 1549, and " 'that the predominate amount of all adult reading material, fiction and nonfiction, could arguably be encompassed within the terms of [the Act].' " *Id.* at 1550 (quoting witness Florence). The court made these observations on the basis of its interpretation that the "serious value" prong of the "harmful to minors" definition must be evaluated in light of what "most minors," including the

youngest potential readers, could understand and appreciate. *Id.*

The court declined to construe section 16–12–103(e)'s requirement that a person must not "knowingly ... exhibit, expose, or display in public ... at any ... public place frequented by minors or where minors are or may be invited as part of the general public: [any material subject to the statute]." Rather than determining the least burdensome compliance strategy actually mandated by this language and then evaluating its constitutionality, the court held that displaying material in an adults-only section of a store open to minors, or covering books with blinder racks or adults-only tags, "would not save the display provision as it is currently drafted" since, given the court's earlier interpretation of the vast amount of works covered by the statute, these strategies "would produce a chilling effect." *Id.* at 1554.

Similarly, the court found that the statute was not a reasonable time, place, and manner restriction since (1) "the methods of display left available in the wake of the Act do not adequately serve the interests of free speech," and (2) defendants failed to submit sufficient evidence that "the limited contact a minor may have with materials displayed in a bookstore produces a negative [secondary effect of speech]" that the state may regulate. *Id.* at 1555.

The court noted, however, that "the chilling effect attendant to the compliance methods suggested by the defendants might be acceptable if the statute did not apply to "classic works of literature" and the predominant amount of adult reading material. *Id.* at 1554. In fact, as the court stated, "a display statute that applies only to materials inappropriate for minors approaching the age of majority might well survive a constitutional attack." *Id.* at 1556. *See also id.* at 1554 n. 17.

Finally, the court found that the statutory exemption provided to libraries is a

---

mandated by section 16–12–103(e) (see below at footnote 31 and accompanying text). Furthermore, the opinion decided the vagueness issue but did not delve into overbreadth or the relationship between the vagueness and overbreadth doctrines, as we do in Part IV.

**10.** *See also McMullen v. Carson,* 754 F.2d 936, 938 (11th Cir.1985). ("In reviewing findings of fact in First Amendment cases, this Court must make an 'independent examination of the whole record,' rather than relying solely on the 'clearly erroneous' standard.") (citations omitted).

classification infringing upon a fundamental right. Since the strict scrutiny test is applicable under the Equal Protection Clause to classifications affecting the exercise of fundamental rights, and the government failed to demonstrate that the library exemption promoted a compelling governmental interest through a narrowly drawn classification, the court found the exemption unconstitutional.[11]

### C. Issues on Appeal

This appeal requires us first to determine whether the reach of the "harmful to minors" definition in section 16–12–102 must be evaluated from the perspective of "any reasonable minor," including an older minor, or whether the tests must be applied in light of the sensibilities and literary comprehension of "most" minors, the "average," or even the youngest minor who might seek access to books or other materials with explicit sexual conduct. Second, we must evaluate the burden on protected speech in light of (1) our interpretation of the amount of material covered and (2) the methods of compliance actually mandated by the ban on display. Finally, we will decide the appropriate standard of review for the classification drawn by the Georgia legislature regarding who may distribute and display to minors material covered by the Act, and who may not.

### DISCUSSION

## II. REVIEWING A FIRST AMENDMENT REGULATION FOR FACIAL VALIDITY

Before considering the specific test or standards by which we must measure the constitutionality of the display ban, it is important to articulate the general interpretive principles applicable in a facial challenge to a statute affecting speech. Outside of the First Amendment context, the Supreme Court has noted the difficulties inherent in a facial challenge:

> that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid. The fact that [the challenged statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid...."

*United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

The Court has recognized that when overly broad statutory language seems to sweep protected First Amendment expression directly into the scope of a regulation affecting speech, or indirectly places an undue burden on such protected activity, free expression can be chilled even in the absence of the statute's specific application to protected speech. For this reason, the Court has recognized the so-called overbreadth doctrine in the limited context of First Amendment facial challenges. *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). Since the overbreadth doctrine in effect requires courts to evaluate the *potential* reach of a statute, *conceivable* sets of circumstances,

---

**11.** The district court's September 26, 1986, order addressed only plaintiffs' challenges to the display and library exemption provisions of the statute.

The court relied on the reasons stated in its June 27, 1984, order, *see Webb I,* 590 F.Supp. at 687–92, to "reject[ ] plaintiffs' contentions with respect to the definition, distribution, and exhibition components of the Act." *Webb II,* 643 F.Supp. at 1551 n. 10. Appellees have not argued on appeal that the district court was incorrect to reject these alleged constitutional infirmities; thus, we do not address these arguments as alternative grounds for upholding the district court's determination that the Act is unconstitutional.

Since it concluded that the display provision was substantially overbroad, the district court declined to reach plaintiffs' contention that the display component is unconstitutionally vague. Appellees have not argued on appeal that any of the provisions in question fail to provide the fair notice required under the Due Process Clause as to what constitutes a criminal offense under the Act; therefore, we need not address that claim either. Appellees have argued, however, that booksellers face an intolerable First Amendment burden in determining which materials are "harmful to minors" under the statutory definition in section 16–12–102. We address that claim at pp. 1505–1506.

and *possible* direct and indirect burdens on speech,[12] "[t]he Supreme Court has noted that the overbreadth doctrine is 'strong medicine' that should be employed only 'with hesitation, and then "only as a last resort."' " *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389, 1391 (8th Cir.1986) (quoting *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (in turn quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973)).

██ When the regulation is not directed at the origin of expression, or at the ultimate right of a person (in this case, an adult) to present or procure protected expression, it does not impinge upon "mere speech"; rather, it regulates the method of presenting, or the form of, expression. Regulations on display affect "conduct plus speech." *Upper Midwest Booksellers,* 780 F.2d at 1391–92; *M.S. News Co. v. Casado,* 721 F.2d 1281, 1289 (10th Cir.1983); *American Booksellers Ass'n v. Rendell,* 332 Pa. Super. 537, 581, 481 A.2d 919, 941 (1984). "[W]hen conduct plus speech is involved, the overbreadth must be 'real' and 'substantial' in relation to [the regulation's] 'plainly legitimate sweep' before the [regulation] should be invalidated on its face." *Upper Midwest Booksellers,* 780 F.2d at 1391–92 (quoting *Ferber,* 458 U.S. at 770, 102 S.Ct. at 3361–62).

██ As the Supreme Court recently stated when considering a facial challenge to a Virginia regulation on the display of materials "harmful to juveniles," courts have an obligation to construe the challenged statute narrowly:

It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The key to application of this principle is that the statute must be "readily susceptible" to limitation. We will not rewrite a state law to conform it to constitutional requirements.

*Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 397, 108 S.Ct. 636, 644–45, 98 L.Ed.2d 782 (1988).[13] Thus, we must consider the allegations of the potential range of materials covered by the statute, and the possible burdens on adults' access imposed by mandatory compliance measures, in light of our twin obligations to (1) construe the statute narrowly, (2) without rewriting its terms.

## III. FIRST AMENDMENT STANDARDS

██ We decline to restate the bedrock case law and general principles of First Amendment jurisprudence which guide our analysis. We are content to note that (1) content-based restrictions on speech survive constitutional scrutiny only under extraordinary circumstances; but (2) material judged "obscene" under the appropriate constitutional standard is not protected by the First Amendment; (3) indirect burdens placed on protected speech in an effort to regulate obscenity must be supported by important state interests and should not be

---

**12.** *Village of Hoffman Estates, Inc. v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982) (quoting *Bagget v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964); (in turn quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)).

**13.** In its last term, the Supreme Court upheld a statute which prohibited the possession of "nude" photographs of minors, subject to several exemptions and "proper purposes" provisions. *Osborne v. Ohio,* —— U.S. ——, 110 S.Ct. 1691,

109 L.Ed.2d 98 (citation omitted). The Court noted that "depictions of nudity, without more, constitute protected expression." 110 S.Ct. at 1698 (citing *Ferber,* 458 U.S. at 765 n. 18, 102 S.Ct. at 3359 n. 18). And given the broad language, "it takes no great feat of imagination to envision situations in which such an ordinance might be unconstitutionally applied." 110 S.Ct. at 1701. However, since the Ohio Supreme Court read the statute as requiring "a lewd exhibition or ... a graphic focus on the genitals," the Court upheld the statute against an overbreadth challenge.

unnecessarily burdensome; and (4) the state's interest in protecting its youth justifies a limited burden on free expression. *See generally Webb II,* 643 F.Supp. at 1551–52 (and cases cited therein).

■ We begin our analysis with the Supreme Court's decision in *Ginsberg* that a state may deny minors access to materials acceptable for adults but obscene for minors. While the statute in *Ginsberg* banned only the *sale* or *distribution* of this material to minors and did not implicate the First Amendment rights of adults, it is clear from our reading of *Ginsberg* that a state may, absent an impermissible burden on adults, deny minors all access *in any form* to materials obscene as to them. Minors have no right to view or in any way consume this material—even if they do not purchase or otherwise take control of it.[14]

■ *Ginsberg* did not address the difficulties which arise when the government's protection of minors burdens (even indirectly) adults' access to material protected as to them. We must look to other case law and general principles of First Amendment jurisprudence to discern the constitutional parameters of the government's power under these circumstances. First, it is clear that a state may not prohibit an adult's access to material that is obscene for minors but not for adults. As the Supreme Court recently reiterated, the First Amendment forbids reducing the adult population to reading and viewing only works suitable for children. *Virginia v. American Booksellers Ass'n,* 484 U.S. at 389, 108 S.Ct. at 640–41 (citing *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 73–74, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469 (1983); *Butler v. Michigan,* 352 U.S. 380, 383–84, 77 S.Ct. 524, 525–26, 1 L.Ed.2d 412 (1957)). Even where statutes have not been upheld, however, the Supreme Court has recognized that some limitation on the access of adults to material protected for them but harmful to minors is permissible. *Sable*

*Communications of California, Inc. v. FCC,* 492 U.S. 115, 109 S.Ct. 2829, 2838–39, 106 L.Ed.2d 93 (1989) (invalidating total ban on adult access to indecent telephone messages but intimating that a statute restricting access through certain means would be narrowly tailored and constitutional); *Butler,* 352 U.S. at 383, 77 S.Ct. at 525–26 (invalidating statute banning reading materials inappropriate for children, but implying that a statute "reasonably restricted to the evil with which it is said to deal" would be constitutional).

Several courts evaluating variously defined display regulations such as the instant one have emphasized that the state's legitimate interest in protecting its young must be balanced against the right of adults to have access to protected material. *See, e.g., Upper Midwest Booksellers,* 780 F.2d at 1394–95; *Webb II,* 643 F.Supp. at 1552. On the one hand, a state's interest in protecting children from exposure to material obscene as to minors is a substantial and important state interest. *Ferber,* 458 U.S. at 757, 102 S.Ct. at 3354–55 (1982); *Ginsberg,* 390 U.S. at 639–42, 88 S.Ct. at 1280–82. On the other hand, the indirect burden on adults' First Amendment right to have access to material not obscene for adults must be narrowly drawn. *See Upper Midwest Booksellers,* 780 F.2d at 1396–97 (regulation must leave open adequate alternative channels, must not restrict expression at its source, and must not impose "significant" restrictions on adult access); *M.S. News Co.,* 721 F.2d at 1288 (restriction on adults' access to material that is not obscene as to them must be reasonable); *Rendell,* 332 Pa.Super. at 581, 481 A.2d at 941 ("incidental restrictions on First Amendment freedoms must be limited to those essential to the furtherance of that interest") (citation omitted).

A number of courts have evaluated variously defined restrictions on the display of

---

**14.** The New York statute upheld in *Ginsberg* extended beyond the sale of such objectionable materials to its exhibition or presentation to minors. *See* N.Y.Penal Law § 484–h, *construed in Ginsberg,* 390 U.S. at 647, 88 S.Ct. at 1284–85. It would be quite anomalous for a court to find

that while minors have no right to *purchase* material unprotected to them, they nevertheless have a right to read or otherwise consume the material without taking permanent control over it as their own property.

material "harmful to minors" in light of the constitutional standards for a reasonable time, place, and manner regulation. Display restrictions affect the manner in which speech may be presented or accessed, in contrast to a regulation of pure speech at its source or an outright ban on its accessibility to adults.[15]

■ We see no relevant distinction in this case between the constitutional standards applicable to a time, place, and manner restriction,[16] and the balancing test described above for a regulation of speech unprotected as to minors that indirectly affects speech protected as to adults. In evaluating the display ban under either test, the crucial inquiry, at least in this case, is whether the restriction on adults' access to protected speech is unnecessarily burdensome or "significant," or, stated differently, whether alternate modes of adult access are unduly restricted.

Appellees contend that Georgia's restriction on the display of material "harmful to minors" burdens protected activity in many ways. The district court considered those potential burdens under the general rubric

of "overbreadth analysis"—a phrase that courts often use loosely to refer to the propensity of a statute to sweep protected activity into its purview, or unnecessarily to burden protected activity through the collateral effects of its operation on unprotected activity. There are, however, several distinct types of overbreadth alleged in this case, each of which require separate analysis.

## IV. OVERBREADTH ANALYSIS

### A. Direct Regulation of Protected Activity.

The type of "legislative overkill" most commonly associated with "overbreadth" results when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech. For example, in *American Booksellers Ass'n v. McAuliffe*, 533 F.Supp. 50 (N.D.Ga.1981), the court struck down as overbroad a Georgia statute banning the distribution to minors of, *inter alia*, a "picture of nude or partially denuded figures posed or presented in a manner to provoke or arouse lust or passion or to

---

**15.** The cases discussed in the text above at pp. 1499–1500 with regard to standards of review for facial overbreadth challenges hold that regulations on display affect only the manner in which speech may be presented. *Upper Midwest Booksellers*, 780 F.2d at 1391–92; *M.S. News Co.*, 721 F.2d at 1289; *Rendell*, 332 Pa.Super. at 581, 481 A.2d at 941.

**16.** In order to be upheld as a reasonable time, place, and manner restriction, a statute must (1) not be based on content or subject matter, (2) be narrowly drawn, (3) further a significant governmental interest, and (4) allow for sufficient alternative forms of expression. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Regan v. Time, Inc.*, 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

As the district court acknowledged, "the *Playtime Theatres* Court concluded that a restriction is content-neutral if it is concerned with the 'secondary effects' of the speech at issue ..., rather than with eradicating a particular type of speech." 643 F.Supp. at 1554 (citations omitted). The "secondary effects" of the regulated speech in *Playtime Theatres* related to the negative impact of adult theaters or "regulated uses"

on a neighborhood's environment. The "secondary effects" of materials protected for adults but obscene to minors stem from the impact of in-store access to such materials by minors. The district court found that the defendants presented no evidence of such "secondary effects" from in-store access. The court reasoned that while in *Ginsberg* the Supreme Court required only a rational basis for the legislative conclusion that an unlimited right to purchase and view sexually explicit materials would be harmful to minors, since the right of adults to have access to such material is implicated, unlike in *Ginsberg*, a higher evidentiary standard is required under *Playtime Theatres*.

We agree with the *Upper Midwest Booksellers* court in finding that the empirical data required to sustain intricate commercial zoning regulations is not necessary to sustain the type of legislation at issue in this case. 780 F.2d at 1397 n. 11. As the *Upper Midwest* court observed, "[w]e see no [legally relevant] distinction between finding that exposure by virtue of the display of proscribed materials is harmful to minors and finding that the sale of proscribed material is harmful." *Id.* A court need only determine that "it was not irrational for the legislature to find that [even fleeting] exposure to material condemned by the statute is harmful to minors." *Ginsberg*, 390 U.S. at 641, 88 S.Ct. at 1281.

exploit sex." On its face, the statute covered material that would not be obscene as to minors under the *Ginsberg* standard; thus, it directly regulated material protected even as to minors and was therefore overbroad. *Id.* at 52–53.

 The definition of material targeted in Georgia Code section 16–12–102 suffers from no such "legislative overkill"; it employs a narrowly crafted *Ginsberg*-type adaptation of the current definition of adult obscenity announced in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973). Although the Supreme Court has not decided what effect *Miller* will have on the *Ginsberg* formulation of a variable obscenity standard,[17] we join other courts in finding that the post-*Ginsberg* definition of adult obscenity announced in *Miller* (as modified for determining that which is obscene to

minors) does not restrict the scope of materials that a state may regulate. *See American Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127 n. 2 (4th Cir.1989); *M.S. News Co.*, 721 F.2d at 1286–87. Both the Georgia law at issue in this case and the New York statute approved in *Ginsberg* "adapted the current obscenity test so it could be used to determine whether material is harmful to minors," *id.* at 1286 n. 4 (comparing the N.Y. statute in *Ginsberg* with a Wichita, Kansas ordinance derived from the *Miller* test). *See American Booksellers Ass'n v. Virginia*, 882 F.2d at 127. Nothing in *Miller* casts any doubt on the constitutional viability of a variable standard of obscenity for minors based upon a *Ginsberg*-like adaptation of the current Supreme Court standard for determining adult obscenity.[18]

17. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 n. 10, 95 S.Ct. 2268, 2275 n. 10, 45 L.Ed.2d 125 (1974).

18. A comparison of (1) the *Ginsberg* standard, (2) the *Miller* standard and (3) the standard articulated in O.C.G.A. § 16–12–102 discloses that *Miller* does not affect the validity of the definition utilized in the Georgia statute, and in general only modifies the third prong of the *Ginsberg* standard for obscenity.

The first prongs of all three tests are essentially the same. *Compare Memoirs v. Massachusetts*, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966) (plurality opinion) *and Ginsberg*, 390 U.S. at 633, 88 S.Ct. at 1276–77 *with Miller*, 413 U.S. at 24, 93 S.Ct. at 2614–15 *and* O.C.G.A. section 16–12–102(1)(A).

The district court suggested that "[t]he *Miller* obscenity test does not incorporate the 'taken as a whole' standard into the second part of the test [articulated in *Memoirs* and *Ginsberg*]." *Webb I*, 590 F.Supp. at 688. The second question in the *Memoirs–Ginsberg* test is whether the material is "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors." *Ginsberg*, 390 U.S. at 633, 88 S.Ct. at 1276–77. *Cf. Memoirs*, 383 U.S. at 418, 86 S.Ct. at 977 (adult standard). Similarly, the second test for adult obscenity in *Miller* is "whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." *Miller*, 413 U.S. at 24, 93 S.Ct. at 2615. Section 16–12–102(1)(B) retains the *Ginsberg* "as a whole" language for the second prong; therefore, even assuming *arguendo* that *Miller* relaxed the standard, the Georgia definition and those like it are either (1) completely consistent with *Miller*, or (2) narrower than the second prong of the more recent test

articulated in *Miller*. A state is entirely free to adopt a test for obscenity that is narrower than current First Amendment jurisprudence requires.

Our reading of the second prong of the test articulated in *Memoirs, see* 383 U.S. at 418, 86 S.Ct. at 977, and in *Ginsberg, see* 390 U.S. at 633, 88 S.Ct. at 1276–77, satisfies us that the *Memoirs–Ginsberg* test for whether the material is "patently offensive" refers specifically to the objectionable portion of the work in question and does not, indeed, cannot logically, be evaluated on the basis of the work as a whole. That is, whether the sexually explicit portion of the work is "patently offensive,"—a necessary condition that is distinct from the other two prongs—does not depend upon or in any way relate to the "work as a whole" or to the unobjectionable portions of the allegedly obscene work. Thus, the absence of the "as a whole" language in the *Miller* test does not work a change in the second prong of the obscenity test.

The apparent confusion stems from the fact that the particular articulation of the second test in the statute at issue in *Ginsberg* asks whether the material was "patently offensive to prevailing standards in the adult community *as a whole*." 390 U.S. at 633, 88 S.Ct. at 1276–77. The plurality opinion in *Memoirs* makes no mention of the "as a whole" requirement. *See* 383 U.S. at 418, 86 S.Ct. at 977. It is our view that the phrase "as a whole" merely modifies "community" and expresses the idea articulated in *Memoirs* and a later case, *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), that the first and second tests under the pre- and post-*Ginsberg* (i.e., *Miller*) definition of obscenity must be judged with reference to the "average" member of the "whole" community, where-

■ Appellees maintain that section 16–12–102's definition is overly broad because it does not accommodate the differences between older and younger minors in maturity levels and capacity to comprehend literary themes. According to appellees, the use of a single standard for all minors denies older minors access to materials that have serious literary value for them.[19]

We disagree, and find that Georgia courts would interpret section 16–12–102 in light of *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). In *Pope*, the Supreme Court construed the test for adult obscenity and held that "[t]he proper inquiry is not whether an ordinary member [of the community] would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole." *Id.* at 500–501, 107 S.Ct. at 1921 (footnote omitted). *Hunter v. State*, 257 Ga. at 571–72, 361 S.E.2d at 788 (1987). As interpreted in *Pope*, the first two prongs of the *Miller* test utilize "contemporary community standards," whereas "serious value" is deter-

mined not with reference to "majority approval," but on the basis of whether any reasonable person would find serious value—even if the community as a whole, or the "average" member of the community, would not. 481 U.S. at 500, 107 S.Ct. at 1920–21. See the discussion in footnote 18 above. *Pope* echoes the fundamental idea that, although "We the People" are sovereign under the Constitution, the Founders added the Bill of Rights as a bulwark against the "tyranny of the majority." If, like the other two prongs of the test for obscenity, we judge "serious value" according to the "degree of local acceptance [the work in question] has won," *id.* at 500, 107 S.Ct. at 1921, then we would compromise the First Amendment's protection against majoritarian pressure to stifle disfavored expression. *See id.* at 500–501, 107 S.Ct. at 1920–21; *id.* at 506, 107 S.Ct. at 1923–24 (Blackmun, J., concurring in part and dissenting in part).

As applied to a *Ginsberg*-type adaptation of the adult obscenity test, *Pope* teaches that if any reasonable minor, including a seventeen-year-old, would find serious val-

---

as the third prong is decided with reference to whether a reasonable member of the community would find serious value in the allegedly obscene material, regardless of whether the "average" member of the community or the community "as a whole" would find serious value. *Id.; Hunter v. State*, 257 Ga. 571, 573, 361 S.E.2d 787, 789 (1987). The first and third prongs also require that the allegedly obscene material be viewed "as a whole." *Id.*

The interpretation that the first two prongs of the *Memoirs–Ginsberg* definition of obscenity were not changed by *Miller* in any way material to this appeal is further supported by the fact that the *Miller* Court did not distinguish the first two prongs of its obscenity test from the *Memoirs–Ginsberg* test, yet it explicitly declined to adopt the "utterly without redeeming social value" test articulated in *Memoirs* and used in *Ginsberg.* The Court instead stated that the state need not prove an "utter" lack of value—a "test that called on the prosecution to prove a negative, *i.e.*, . . . a burden virtually impossible to discharge under our criminal standards of proof," 413 U.S. at 22, 93 S.Ct. at 2613, but must instead show that the material, "taken as a whole," lacks serious literary, artistic, political or scientific value." *Id.* at 24, 93 S.Ct. at 2615. In other words, *Miller* relaxed the third prong of the obscenity test and allowed the government

to regulate material that satisfies the other two prongs of the test and has little or no value to society. We see no reason why the change in section 16–12–102(1)(C) to reflect the *Miller* standard for serious value should in any way affect the *Ginsberg* holding that the government may prohibit the sale or distribution of material deemed obscene under the current Supreme Court definition of obscenity for adults, as modified to apply to minors.

19. The district court seemed to reject this argument in its first order: "the Court cannot accept plaintiffs' premise that a single standard for all minors necessarily . . . 'restrict[s] older minors to reading or reviewing that which is appropriate for the very young or immature child,'" *Webb I*, 590 F.Supp. at 688–89 (footnote omitted), only to embrace it in its second order. The *Webb II* court interpreted the statute to cover "'the predominant amount of all of the adult reading material'" because the serious value prong must be applied in light of what "most" minors can comprehend, and would cover any work satisfying the first two prongs of the obscenity test while having serious literary value that a ten-year-old could not appreciate, *Webb II*, 643 F.Supp. at 1550, or that would not be suitable for a fifth-grade reading list, *id.* at 1548.

ue, the material is not "harmful to minors."[20] As the Fourth Circuit and the Virginia Supreme Court recently observed, " 'if a work is found to have serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole.' " *American Booksellers Ass'n v. Virginia*, 882 F.2d at 127 (quoting *Commonwealth v. American Booksellers Ass'n*, 236 Va. 168, 372 S.E.2d 618, 624 (1988)).[21]

Section 16–12–102 therefore does not reach materials protected as to minors and is not overly broad in that sense. As we discuss below, this interpretation of the statute's coverage also dramatically decreases the amount of material actually covered by the ban on display and the indirect burden suffered by adults as a result.[22]

Even when the state regulates only speech that is unprotected to one group (minors), the restriction can collaterally burden speech that is protected for another group (adults). The regulation can be "overly broad" if it indirectly produces an unnecessary or intolerable restriction on protected speech.

**B.** *Indirect Regulation of Protected Activity.*

1. Overbreadth from indeterminacy.

▆▆ The overbreadth and vagueness doctrines are related yet distinct. *M.S. News Co.*, 721 F.2d at 1287.

"The vagueness doctrine is anchored in the Due Process Clauses of the Fifth and Fourteenth Amendments, and protects against legislation lacking sufficient clarity of purpose and precision in drafting. *See Erznoznik v. City of Jacksonville*, [422 U.S. 205,] at 217–218, 95 S.Ct. [2268,] at 2276–77 [45 L.Ed.2d 125 (1975)]; *Grayned v. City of Rockford*, 408 U.S. 104, 108–14 & n. 5, 92 S.Ct. 2294, 2298–302 & n. 5, 33 L.Ed.2d 222 and n. 5 (1972).

*Id.* (footnote omitted). The vagueness doctrine focuses on whether the law in question affords a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108–109, 92 S.Ct. at 2298–99. "Overbroad legislation need not be vague, indeed it may be too clear; its constitutional infirmity is that it sweeps protected activity within its proscription." *M.S. News Co.*, 721 F.2d at 1287 (citation omitted).

The overbreadth and vagueness doctrines are related in that "a court should

---

**20.** A seventeen-year-old is of course a member of the group to which "prevailing standards in the adult community as a whole with respect to what is suitable material for minors" must be applied under § 16–12–102(1)(C). The addition of a second layer of analysis in a variable obscenity standard, *i.e.*, asking what a reasonable member of the adult community thinks would hold serious literary value for a reasonable minor, does not affect the rule articulated in *Pope.*

**21.** The Supreme Court made no mention of any such overbreadth problem when it upheld the New York statute in *Ginsberg* despite the fact that the "utterly without redeeming social value" prong of the then-current obscenity standard made no explicit provision for the varying levels of maturity and literary comprehension amongst minors. Curiously, appellees do not appeal the ban on the sale or loan of material defined in section 16–12–102 even though the interpretation that the statute covers material that would hold serious value for older minors

would raise serious constitutional overbreadth concerns for *both* a display ban *and* a prohibition on sales to older minors. The encroachment on the access of older minors to material which holds serious literary value for them would be just as great if the statute in question banned the sale of such protected material to older minors as if the statute banned its display.

**22.** This is not to say that the statute covers only material already subject to Georgia's general obscenity statute, O.C.G.A. § 16–12–80. For example, Defendant's Exhibit 1, *Human Digest* (June 1984), found in a convenience store with no restrictions on in-store access by minors, would be "harmful to minors" and thus subject to section 16–12–103's bans on sales to minors and display. The cover refers to several articles within that are written from the juvenile perspective: " 'Why My Mom Loves Oral Sex!' "; " 'I Made X–Rated Videos for Dad!' "; " 'Sex Slave Sis!' "; and " 'My Anal Aunt!' ".

evaluate the ambiguous as well as the unambiguous scope of the enactment.... [since] ambiguous meanings cause citizens to ' "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.' " *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982) (quoting *Bagget v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964); (in turn quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)).

■ Based upon its interpretation that the serious value of a work must be evaluated with reference to that which "most" minors, or even a ten-year-old minor, would appreciate, and that the statute thus applies to a vast amount of adult reading material, the district court found that the statute places an intolerable burden on booksellers to determine which books the display ban would reach. The tremendous volume of material published and the practical inability of booksellers to gain more than a synoptic familiarity with the material they order from publishers would, according to the court, force booksellers to err on the side of caution by "refusing to order [for display] any book with a suggestive cover or the works of an author known for sexually explicit prose." *Webb II,* 643 F.Supp. at 1550.

We believe that the burden on booksellers would be far less than the district court suggests. First, since only a minimal number of works will have serious value for reasonable adults but not for reasonable minors, including older minors, the statute will not increase to any great extent the screening that stores must do in order to comply with Georgia's general ob-

scenity statute, O.C.G.A. § 16–12–80.[23] Second, despite the increased opportunity to evaluate the fitness of material at the *point of sale* to minors, as opposed to *ordering* from a publisher for display sales,[24] the display ban will only incrementally increase the screening necessary for booksellers to comply with the prohibition on the sale of "harmful" material to minors, a burden the district found constitutional under *Ginsberg*—a holding that appellees do not appeal. Finally, section 16–12–103(e) only prohibits displays that are made "knowingly." [25] For these reasons, we find that section 16–12–102's definition does not render the display ban substantially overbroad due to indeterminacy.

## 2. Overbreadth and the burden of mandatory compliance strategies.

If in an ideal world it were possible to make the material defined in section 16–12–102 invisible to minors but completely visible and accessible to adults, we would need to inquire no further. As we interpret it, the statute covers only material unprotected to minors and is not so indeterminate that it unduly chills protected expression. Since in the real world material cannot be made "invisible" to minors without hampering to a certain extent adults' access to it, we must analyze the compliance strategy section 16–12–103(e) actually mandates.

■ The statutory "breadth" that we analyze in this context refers to the degree of practical inconvenience actually required by the language of subsection (e). Only by focusing on that which the statute *requires* for compliance with the display ban, rather than on every compliance strategy that is sufficient but not necessary under the statute, can we determine whether section 16–12–103(e) is "substantially overbroad" or

---

23. The district court agreed that if "materials can be displayed if they hold literary value for anyone under the age of eighteen," 643 F.Supp. at 1554 n. 17, the burden on booksellers would be substantially decreased. "The court indicates that if the display provision applied only to material on the fringe of protected expression," *id.* at 1554, or only material "inappropriate for minors approaching the age of majority," *id.* at 1556, it would be constitutional.

24. A bookstore owner testified that it is easier to comply with the sales prohibition since "at the point of sale [the bookseller] has the opportunity to assess the maturity of the purchaser and to review the book selected." *Webb II,* 643 F.Supp. at 1551 n. 9.

25. See the Appendix to this opinion for the definition of "knowingly" in section 16–12–102(2).

"not narrowly drawn." Since this is a facial challenge, we cannot, as appellees seem to suggest, consider the constitutional propriety of the most onerous methods of compliance which a broad reading of subsection (e) could possibly require. Such an evaluation must await specific enforcement facts and a different interpretation of the law by the Georgia courts.

In order to violate section 16–12–103(e), a person must knowingly "exhibit, expose, or display in public ... at any ... public place ... where minors are or may be invited as part of the general public" [26] a sexually explicit "visual representation" that satisfies the three-pronged test under section 16–12–102, or "printed material" or a "sound recording" that contains a "visual representation" or a sexually explicit narrative account that is obscene as to minors under section 16–12–102.

First, it is beyond cavil that, regardless of the specific method booksellers [27] choose to comply with the statute, they must deny minors unfettered physical access to offensive material. Even if it technically satisfies the prohibition on "display[ing]" such material, any method of compliance by which a person knowingly permits minors an unfettered opportunity to peruse the material would elevate form over substance and violate section 16–12–103(e).

Second, we read "where minors are or may be invited as part of the general public" as limiting the clauses specifying the types of premises upon which display is banned. Thus, if minors are denied access to the premises, booksellers may display such material openly without violating the statute. Indeed, even a separate room or physical structure that is inaccessible to minors could presumably house open displays of the material. But we do not read section 16–12–103(e) as *requiring* such

compliance strategies; thus we need not consider whether the burden on adults' access would be overbroad.

The use of the terms "exhibit," "expose," and "display"—especially as modified by "in public"—strongly suggests that the mere *presence* of material "harmful to minors," even in that part of premises frequented by minors, would not violate section 16–12–103(e). One court, construing the word "display" in the context of statutory language very similar to section 16–12–103,[28] recognized that common dictionary definitions of the term connote an open and ostentatious placement of the material:

> BLACK'S LAW DICTIONARY (5th Ed. 1979) defines a "display" as "an opening or unfolding, exhibition, manifestation, ostentatious show, exhibition for effect, parade." Similarly, WEBSTER'S NEW COLLEGIATE DICTIONARY (1976) states that "to display" is to "put or spread before the view publicly," "make evident," "exhibit ostentatiously," or "show off."

*Rendell*, 332 Pa.Super. at 575, 481 A.2d at 938 (footnote omitted). The *Rendell* court interpreted the ban on "display" as not applying to the open shelving of material "harmful to minors":

> These definitions suggest that the mere shelving or stocking of questionable material, without in some manner directing attention to them, is not the type of conduct prohibited by virtue of the legislature's use of the term "display."

*Id.* at 575–76, 481 A.2d at 938–39.

While we agree that the terms "exhibit," "expose," and "display" connote an open and ostentatious placement of the materials, we cannot agree that the Georgia legislature sanctioned in section 16–12–103(e) the open shelving of material "harmful to

---

**26.** We have omitted several of the more specific terms in section 16–12–103(e) that are somewhat redundant given the more general phrases also utilized.

**27.** We use the word "booksellers" throughout this passage to refer generically to any person subject to the statute.

**28.** The statute at issue in *Rendell,* 18 Pa.Cons. Stat. § 5903(a)(1), prohibited, in relevant part,

the "display [of material obscene as to minors under a three-prong test similar to O.C.G.A. § 16–12–102] ... in any business or commercial establishment where minors ... are or probably will be exposed to view all or any part of such materials." *See* 332 Pa.Super. at 566, 481 A.2d at 934.

minors." The use of the term "expose" suggests that even unadvertised and passive placement of the material entirely in open sight would violate section 16–12–103(e).[29]

Appellants have suggested a number of compliance strategies that they claim would satisfy section 16–12–103(e). They assert that openly displaying material "harmful to minors" in an area "supervised by the clerks in order to keep them out of the hands of minors," Appellants' Brief at 44, or in "adults[-]only racks or sections,"[30] id. at 41, would be acceptable. We disagree. Although these methods would prevent actual physical access and perusal by minors—a fundamental aim of the statute—section 16–12–103(e) is not "readily susceptible" to an interpretation allowing such a compliance strategy. Unlike the Virginia statute which the Fourth Circuit recently upheld, section 16–12–103(e) does not contain language that narrows the com-

mon usage of the word "display".[31] Placing the material entirely in open sight in an establishment "where minors are or may be invited as part of the general public" would violate section 16–12–103(e) despite a "nonperusal" policy or signs indicating that certain otherwise open areas are off-limits to minors.

■ Appellants also suggest that the statute is satisfied by placing material "harmful to minors" behind devices commonly referred to as "blinder racks" or shelves which cover at least the lower two-thirds of material that would otherwise be exposed to view. Id. at 41–43. See M.S. News, 721 F.2d at 1287 (briefly describing "blinder racks"). We agree. Simply put, blinder racks do not "exhibit, expose, or display in public" material subject to section 16–12–103(e); they eliminate the ostentatious and open placement of the materials.[32] Therefore, under our reading of sec-

---

**29.** The Colorado Supreme Court struck down a display ban with identical language as section 16–12–103(e) in *Tattered Cover, Inc. v. Tooley,* 696 P.2d 780 (Colo.1985) (construing Colo.Rev. Stat. § 18–7–502(b)(5) (Supp.1984)). However, in *Tattered Cover, Inc.* the parties stipulated that there were only five ways to comply with the statute:
> (1) prohibiting entry into the plaintiffs' stores of persons under the age of eighteen; (2) refusing to carry or display all sexually explicit material; (3) refusing to carry or display material proscribed by the Act; (4) restricting access to substantial portions of their material by segregating sections of their establishment with an "adults only" section; and (5) establishing an "adults only" section solely for material proscribed by the Act.
*Id.* at 783. The Colorado Supreme Court found the statute unconstitutional explicitly on the basis of the trial court's factual finding that the stipulated compliance strategies were not commercially feasible. The parties in this case, by contrast, have not stipulated that these are the only ways in which section 16–12–103(e) may be satisfied. We construe section 16–12–103(e) as affording several less burdensome compliance options.

**30.** We interpret "adults[-]only sections" to refer to aisles or open places in a store not physically separate from areas accessible to minors. As we understand their use of this phrase, appellants suggest that material "harmful to minors" could be displayed openly if the store had in place adequate signs and/or a surveillance policy insuring that the adults-only area and its contents were not accessible to minors. Such a

"section" or "aisle" is distinct from a physically segregated room or area inaccessible to minors.

**31.** Va.Code Ann. § 18.2–391(a) (1989) makes it unlawful "to knowingly display [material deemed "harmful to minors"] *in a manner whereby juveniles may examine or peruse [it]."* (Emphasis added.) *See American Booksellers Ass'n v. Virginia,* 882 F.2d at 126–27. In answer to a question certified by the United States Supreme Court in an appeal of the Fourth Circuit's earlier decision that the statute was unconstitutional, *see* 484 U.S. 383, 108 S.Ct. 636, the Virginia Supreme Court found that the statute would be satisfied by a store policy of prohibiting the perusal of such material by minors whenever observed. *Commonwealth v. American Booksellers Ass'n,* 236 Va. 168, 372 S.E.2d 618 (1988).

**32.** As we stated in the text above, regardless of the method chosen to comply with the statute, minors must be denied the opportunity to peruse the material subject to section 16–12–103(e). The ban on "display" would be but a pyrrhic victory for the legislature and would not serve the purpose of protecting minors if they were allowed simply to reach over the blinder rack and remove the material for unfettered perusal. We need not specify the steps that must be taken to assure that the opportunity to browse is eliminated. Since any violation of section 16–12–103 must be done "knowingly," we are confident that a number of options are available that would eliminate the perusal by minors of material placed behind blinder racks without hindering adults' access to such material.

tion 16–12–103(e), it is not necessary that booksellers physically segregate material placed behind blinder racks from material accessible to minors. Since the statute is "readily susceptible" to such a reading, we need not consider broader interpretations of the requirements for compliance with section 16–12–103(e). *Virginia v. American Booksellers Ass'n*, 484 U.S. at 397–99, 108 S.Ct. at 645 (1988).[33] Placing the relatively small amount of reading material subject to section 16–12–103 behind blinder racks only slightly burdens adults' access to such material. Blinder racks do not impose a "substantially overbroad" regulation on "conduct plus speech." (See the discussion above at pp. 1499–1500, 1502.) Adults may peruse and purchase the material without restriction. Under either the balancing test for regulations on material protected to one group but not another, or the test for the constitutionality of a time, place, and manner regulation, (see the discussion above at p. 1502), the burden on adults' access to material protected as to them is constitutionally insignificant and therefore permissible. *See M.S. News*, 721 F.2d at 1288–89 (relying in part on blinder racks exception to uphold statute against facial challenge).

## V. EQUAL PROTECTION AND THE LIBRARY EXEMPTION

 Section 16–12–104 exempts "any public library operated by the state or any of its political subdivisions[, or] any library operated as a part of any school, college, or

university," from each of the restrictions in section 16–12–103 on the distribution, exhibition, or display of materials "harmful to minors." Thus, while it would be unlawful for any person to "sell or loan" to a minor material deemed obscene as to minors under section 16–12–102, or to exhibit to a minor a motion picture satisfying the three-pronged test, it would be permissible for a public library to do so. Similarly, while it would be lawful for a library to display material that is "harmful to minors," a person would be subject to criminal penalties for knowingly undertaking the same activity on the premises of, for example, a convenience store open to minors.

The district court correctly determined that "[t]he critical step in Equal Protection analysis is determining the proper standard of review." *Webb II*, 643 F.Supp. at 1555. We disagree, however, with the district court's determination that the legislature's classification in this case is subject to strict scrutiny.

Several courts have addressed this question and have differed on whether strict scrutiny is appropriate. Without elaborating, the district court adopted the approach followed in *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 602 F.Supp. 1361, 1374 (D.Minn.1985), *aff'd*, 780 F.2d 1389, 1398 (8th Cir.1985) (exemption from regulation on manner of display). In that case, the Eighth Circuit affirmed a district court's determination that "the strict scrutiny test is the proper standard whenever

---

**33.** We recognize that it is possible to read section 16–12–103(e) to require more than the use of blinder racks. It was suggested at oral argument that in order to satisfy section 16–12–103(e) in an establishment open to minors, material "harmful to minors" must be (1) placed behind or underneath the counter, or in some other area not visible to the general public but available to adults upon request; (2) sealed in plastic and/or fitted with an opaque cover, depending on whether its cover or contents, or both, were subject to the ban, *see* § 16–12–103(e)(1) and (e)(2); or (3) placed in a physically separate room or area from that portion of the establishment open to minors. We make no determination as to whether these suggestions would satisfy the statute.

Given the district court's factual finding that sales of reading material depend heavily on its "display" and availability for perusal by adults, and that requiring adults to request material kept underneath the counter can inhibit choice, these compliance strategies in general seem to impose more burden on adults' access to material protected as to them. We need not determine whether such burdens would be constitutionally permissible, however, since in a facial challenge the possibility that the Georgia courts could conceivably interpret section 16–12–103(e) more broadly than we do is insufficient to render it invalid. *Virginia v. American Booksellers Ass'n*, 484 U.S. at 397–99, 108 S.Ct. at 645; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

government classifies individuals' ability to exercise a fundamental right such as speech." 602 F.Supp. at 1374. Our research indicates that only the Colorado Supreme Court, in *Tattered Cover, Inc. v. Tooley*, 696 P.2d 780, 786 (Colo.1985), has agreed that strict scrutiny applies to a classification involving materials deemed "harmful to minors." [34]

The Tenth Circuit held in *M.S. News* that the rational basis test applies to a "classification that distinguishes between commercial and noncommercial enterprises" in a regulation requiring the former group but not the latter to place behind blinder racks material obscene as to minors. [35] 721 F.2d at 1291–92. The Ninth Circuit has recently approved of this approach:

> We agree with the Tenth Circuit's approach in *Casado*. The Supreme Court has held that obscene speech is not protected by the first amendment. *See Mil-*

ler v. California, . . . . A valid obscenity statute that follows the three-part definition of obscenity set out in *Miller* does not punish the exercise of a fundamental right. There is no fundamental right to engage in obscene speech. Strict scrutiny is thus not appropriate.

The Supreme Court cases applying strict scrutiny to classifications in statutes regulating speech are easily distinguished. Th[e statutes challenged in those cases] all regulated or prohibited *protected* speech, rather than obscenity.

*Ripplinger v. Collins*, 868 F.2d 1043, 1050 (9th Cir.1989) (also criticizing the *Upper Midwest Booksellers* and *Webb II* approach) (citation omitted). *See also Rendell*, 332 Pa.Super. at 583, 481 A.2d at 942; *Long v. 130 Market St. Gift & Novelty of Johnstown*, 294 Pa.Super. 383, 395, 440 A.2d 517, 523 (1982).[36]

**34.** In *Kucharek v. Hanaway*, 714 F.Supp. 1499, 1517 (E.D.Wis.1989), a district court struck down Wisconsin's adult obscenity law on vagueness grounds but upheld a library exemption under the rational basis test. The court acknowledged in passing dicta that strict scrutiny might be appropriate for evaluating classifications involving material that is obscene for children but not adults. The Seventh Circuit recently reversed the vagueness holding and affirmed the library exemption without discussing this dicta. *Kucharek v. Hanaway*, 902 F.2d 513 (7th Cir.1990).

**35.** Although the *M.S. News* court referred to the exemption in that case as generally turning on the commercial/noncommercial distinction, the Wichita ordinance at issue did not refer explicitly to "commercial" use; instead, it provided an affirmative defense if the material or performance was "displayed, presented or disseminated to a minor at a recognized and established school, church, museum, medical clinic, hospital, public library, governmental agency, quasi-governmental agency and [if done] for a bona fide governmental, educational or scientific purpose." Code of the City of Wichita § 5.68.156(3) (1979). *See M.S. News*, 721 F.2d at 1291.

Appellees make much of the fact that section 16–12–104 does not turn specifically on whether the material is distributed, exhibited, or displayed commercially rather than noncommercially. Appellees' Brief at 44–45. *See also Webb II*, 643 F.Supp. at 1556 n. 20 (noting "that the legislature apparently rejected the commercial/noncommercial distinction in amending the Act"). Appellants respond that "[e]ven though the Georgia Act does not on its face exempt as many non-commercial distributions

or displays as did the Wichita ordinance [in *M.S. News*], it is clear that the exempted conduct under the Georgia law is in fact non-commercial." Appellants' Brief at 55. Outside of "suspect classification" Equal Protection analysis, the specific facts upon which the legislature's classification turns do not shed light on the "fundamentalness" of the right affected by the classification; therefore those facts do not influence the level of scrutiny that a court must apply. Rather, the facts upon which the classification turns help explain both its legislative purpose and the likelihood that the classification will serve this purpose.

**36.** The application of the strict scrutiny standard in cases involving classifications drawn in laws regulating material that is not obscene as to either adults *or* minors does not conflict with our holding in this case. In a case relied upon by the *Upper Midwest* court, for example, *Salem Inn, Inc. v. Frank*, 522 F.2d 1045, 1049 (2d Cir.1975), the Second Circuit applied strict scrutiny to an ordinance prohibiting topless dancing in bars, restaurants and various other establishments, but allowing such dancing in opera houses, theaters and other places. *See id.* at 1046–47 (describing the classification). The *Salem Inn* court explicitly pointed out that its decision to apply strict scrutiny turned on the fact that on its face the ordinance reached displays "of the partially nude female form" that were not obscene as to even minors and thus constituted completely protected expression:

> We reemphasize that the ordinance here is directed not at lewdness or obscenity but at nudity which, the [Supreme] Court has reminded us, is not per se 'obscene even as to minors.'

■ The constitutional protection accorded to the right which the legislature classifies—and thus judicial scrutiny of the classification—should depend not on broad propositions such as "free speech is fundamental," or "obscenity is unprotected," but, rather, on the specific nature of the conduct that the legislature has decreed one group may engage in, while a separate class may not. By looking precisely at the conduct implicated by the exemptions to each of the provisions in the Georgia statute, we see that the classification on the right to sell or loan material to minors that is obscene as to them is somewhat distinct from the right to display such material to adults without regulation.[37]

### A. A classification on the Right to Sell or Loan Obscene Materials to Minors.

■ The *Ginsberg* Court held without equivocation that the Constitution does not protect the decision to sell or loan to minors material that is obscene under a variable obscenity standard. If the state has a rational basis for concluding that a legitimate interest will be served by the classification, it may create distinctions between the rights of persons and entities to engage in conduct not protected by the Constitution. *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294–95, 36 L.Ed.2d 16 (1973).

The state clearly has an interest in making such material available to minors, if at all, only in an environment free of the commercial pressure to pander to a minor's prurient interest in sex. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 57, 93 S.Ct. 2628, 2635, 37 L.Ed.2d 446 (1973); *Young v. American Mini Theatres*, 427 U.S. 50, 69, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (plurality). Although the exclusion under the *Miller* test (as adapted in light of *Ginsberg, see* section 16–12–102(1)(C)) for material with "serious literary, artistic, political, or scientific value to minors" will already exempt most sexually explicit material that one would expect to find in a public library, the library exemption preserves the accessibility of such material to minors for purely educational purposes.[38]

■ The fact that the state has chosen not to exempt all noncommercial entities, or even specific noncommercial entities that could be expected to promote the same interests as libraries, is of no consequence so long as the particular exemption chosen has, as in this case, a rational basis. If the classification itself is not based upon a suspect distinction such as race,[39] the Equal Protection Clause is not offended by an under-inclusive or over-inclusive restriction on one's ability to engage in conduct that is not protected by the Constitution. *United States v. Thornton*, 901 F.2d 738

*Id.* at 1049 (citation omitted). *See also Cruz v. Ferre*, 571 F.Supp. 125, 134 (S.D.Fla.1983) (strict scrutiny applied to classification drawn between broadcast and cable television in regulation reaching indecent but not obscene material), *aff'd*, 755 F.2d 1415 (11th Cir.1985).

The *Ripplinger* court agreed with the rational basis test approach in *Casado*, but placed *Tattered Cover, Upper Midwest* and *Webb II* within the category of cases including *Salem Inn* and *Cruz*, rather than *Casado*—although it acknowledged that "[n]either [*Upper Midwest* nor *Webb II*] is written so narrowly." *Ripplinger*, 868 F.2d at 1050 n. 7. We do not agree that the Minneapolis ordinance and the Colorado and Georgia statutes dealt with regulations on "'sexually explicit' material rather than 'obscenity' as defined in *Miller v. California*." *Id.* The regulations in all three cases regulated not merely "sexually explicit" material, but material that is at least obscene as to minors. *See Upper Midwest*, 780 F.2d at 1390–91; *Webb II*, 643 F.Supp. at 1549–50; *Tattered Cover, Inc.*, 696 P.2d at 787.

37. The right to sell an admission ticket to a minor for a motion picture or other presentation that is obscene as to minors under section 16–12–102 is, for the purposes of this discussion, virtually the same as selling or loaning to minors material that is obscene as to them. Thus, the exemption to section 16–12–103(b) implicates the same equal protection analysis as the exemption to section 16–12–103(a), which is discussed in the text.

38. The Seventh Circuit has suggested that library exemptions in obscenity statutes also serve the purpose of shielding libraries from groundless complaints that they are disseminating obscene materials. *Kucharek v. Hanaway*, 902 F.2d 513 (7th Cir.1990).

39. Appellees have not argued that the classification is itself "inherently suspect" and therefore deserving of strict scrutiny under another branch of Equal Protection analysis.

(9th Cir.1990). Finally, striking down such an exemption would hinder rather than promote robust speech.

### B. *A Classification on the Right to Display Material Obscene as to Minors.*

■■■ Although the classification between libraries and nonlibraries presents a closer question when applied to the ban on the display of materials obscene as to minors, we find that strict scrutiny is not warranted. First, we note that while the Constitution does not protect the distribution to minors of material obscene as to them, creators, publishers, and sellers of such material, as well as adults, are protected from significant or overbroad restrictions on adults' access to materials not obscene as to adults. Nevertheless, as we discussed above, this protection is not absolute. Since the state may make such material unavailable to one segment of society—minors—due to its offensiveness and lack of "serious value" for them, it may also impose a necessary and moderate amount of burden on the group for whom such material is protected—adults—in an effort to protect young adolescents. Simply put, the Constitution does not protect unfettered, open placement of such materials in public places accessible to minors.

Even though the First Amendment is unoffended by a requirement that erotic material not obscene to adults be placed behind blinder racks, we must consider whether, given the unique nature of the right involved, a state may allow one group of entities—libraries—to operate free of this restriction, while all other entities must adhere to the ban on display.

First, we note that the plurality in *American Mini Theatres* found that even a content-based classification of exotic but not obscene material did not violate the Equal Protection Clause since what was ultimately at stake was not the material's total

suppression, but only the place where it could be exhibited. 427 U.S. at 71–72, 96 S.Ct. at 2452–53.[40]

> [E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate.... Whether political oratory or philosophical discussion moves us to applaud or to despise what is said, every schoolchild can understand why our duty to defend the right to speak remains the same. But few of us would march our sons and daughters off to war to preserve the citizen's right to see "Specified Sexual Activities" exhibited in the theaters of our choice. Even though the First Amendment protects communication in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures.

*Id.* at 70–71, 96 S.Ct. at 2452.

The classification drawn between libraries and nonlibraries in section 16–12–104 is even less deserving of strict scrutiny since, unlike the zoning ordinance in *American Mini Theatres*, it turns not on the content of the material presented—the exemption *and* the ban on display operate only on material obscene as to minors—but on the characteristics of the entity displaying the material—the *medium* of expression. *See Ripplinger*, 868 F.2d at 1051.

The exemption for display of materials harmful to minors at libraries serves the same interests as the exemption for distribution and is rationally related to making material covered by the Act available in an atmosphere free of commercial pressure and generally available for educational pur-

---

**40.** The *American Mini Theatres* plurality upheld a zoning requirement that prohibited more than one adult theater within 1000 feet of any two other "regulated uses." *See* 427 U.S. at 53 n. 3, 96 S.Ct. at 2444 n. 3 (defining "regulated uses"). Only theaters licensed to present material "characterized by an emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' ... (as defined [elsewhere in the zoning ordinance])" were subject to the "1000 feet rule." *Id.* at 53, 96 S.Ct. at 2444. Other theaters, like the libraries specified in section 16–12–104 of the Georgia statute, were unrestrained.

poses. As stated above, the under- or over-inclusiveness of the classification does not offend the Equal Protection clause so long as the classification is rationally related to the state's interest.[41]

## CONCLUSION

The judgment of the district court is REVERSED.

## APPENDIX

16–12–102 Definitions.

As used in this part, the term:

(1) "Harmful to minors" means that quality of description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it:

(A) Taken as a whole, predominantly appeals to the prurient, shameful, or morbid interest of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(C) Is, when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

(2) "Knowingly" means having a general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:

(A) The character and content of any material described in this part which is reasonably susceptible to examination by the defendant; and

(B) The age of the minor; provided, however, that an honest mistake shall constitute an excuse from liability in this part if the defendant made a reasonable, bona fide attempt to ascertain the true age of such minor.

(3) "Minor" means a person less than 18 years of age.

(4) "Sadomasochistic abuse" means actual or simulated flagellation or torture by or upon a person who is nude, clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound, or otherwise physically restrained by one so clothed or nude.

(5) "Sexual conduct" means actual or simulated acts of masturbation, homosexuality, sexual intercourse, or physical contact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such be female, breasts.

(6) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(7) "Sexually explicit nudity" means a state of undress so as to expose the human male or female genitals, pubic area, or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state. (Code 1981, § 16–12–102, enacted by Ga. L.1983, p. 1437, § 2; Ga.L.1984, p. 1495, § 3.)

16–12–103. Selling, loaning, or exhibiting.

(a) It shall be unlawful for any person knowingly to sell or loan for monetary consideration or otherwise furnish or disseminate to a minor:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic

---

**41.** The focus of classification between exempt and nonexempt entities must of course relate to a state's interest in protecting minors from the harmful effects of material that is obscene as to them. A state could not draw a classification affecting speech protected to one group but not another to serve an interest unrelated to protecting the group for which the expression is unprotected. For example, the state could not draw a classification on the right to somehow deal in such material in an effort to address the effect of such quasi-protected speech on neighborhoods, *see American Mini Theatres,* or some such other secondary effect of the speech *unrelated* to the state's interest in protecting the group for whom such material is unprotected—in this case, minors.

abuse and which is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.

(b) It shall be unlawful for any person knowingly to sell or furnish to a minor an admission ticket or pass or knowingly to admit a minor to premises whereon there is exhibited a motion picture, show, or other presentation which, in whole or in part, depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors or exhibit any such motion picture at any such premises which are not designed to prevent viewing from any public way of such motion picture by minors not admitted to any such premises.

(c) It shall be unlawful for any minor falsely to represent to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that such minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(d) It shall be unlawful for any person knowingly to make a false representation to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that he is the parent or guardian of any minor or that any minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(e) It shall be unlawful for any person knowingly to exhibit, expose, or display in public at newsstands or any other business or commercial establishment or at any other public place frequented by minors or where minors are or may be invited as part of the general public:

(1) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or

(2) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors. (Code 1981, §§ 16–12–103, 16–12–104, enacted by Ga.L.1983, p. 1437, § 2; Ga.L.1984, p. 22 § 16; Ga.L.1984, p. 1495, § 3.)

16–12–104. Library exception.

The provisions of the Code Section 16–12–103 [the distribution, exhibition, and display bans] shall not apply to any public library operated by the state or any of its political subdivisions nor to any library operated as a part of any school, college, or university. (Code 1981, § 16–12–104, enacted by Ga.L.1984, p. 1495, § 3.)

POINTER, Chief District Judge, concurring in part and dissenting in part:

I agree with most of the majority's opinion, and specifically concur in the decision that the library exemption provided by section 16–12–104 is constitutional.

I respectfully dissent, however, from the decision upholding the display proscriptions of section 16–12–103(e). In Part IV–B–2 of the opinion, the majority conclude that section 16–12–103(e) can be read to permit booksellers to avoid criminal penalties by using "blinder racks." If I agreed on this point, I would agree with their decision as to the constitutionality of the section. Al-

though on this appeal we should assume that Georgia would adopt a narrow construction of the section, any such narrowing construction would have to be a reasonable one in the light of the words of the statute. I do not believe that the statute adopted by the Georgia legislature is "readily susceptible" to the interpretation approved by the majority.

Section 16–12–103(e) makes it unlawful to "display in public at ... any ... business or commercial establishment or at any other public place ... where minors are or may be invited as part of the general public ... any ... printed matter ... which *contains* any ... explicit and detailed verbal descriptions ... of sexual conduct ... and which, taken as a whole, is harmful to minors." (*emphasis added*) The statute does more than prohibit the display of the materials that are harmful to minors; it prohibits the display of printed matter that "contains" such harmful materials. It makes criminal the display of a magazine with an innocuous cover if harmful materials are to be found inside the cover—and this is so whether or not any minor is permitted to view the harmful materials themselves. The proscription would likewise apply if a portion of the cover were shielded by "blinder racks."

The only case mentioned in the opinion when discussing this question is *M.S. News Co. v. Casado,* 721 F.2d 1281 (10th Cir. 1983). *M.S. News* does support the proposition that permitting materials to be displayed behind blinder racks would save the statute from attack; it does not, however, provide any support for concluding that the Georgia statute contains any such exception. The city ordinance at issue in that case prohibited the display of harmful materials (not of publications containing such materials) and contained an express exception for displays in blinder racks.

I suggest that the majority, under the rubric of interpreting or construing the statute, have simply rewritten it.